IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY. MODICA, KATARZYNA A. MODICA a.k.a. KATIE MODICA, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:14-cv-03308 |
| v. | ) ) ) | Judge Zagel |
| GREEN TREE SERVICING, LLC., a Delaware Corporation, | ) ) ) ) | |
| Defendant. | ) | |

## LOCAL RULE 56.1 STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, Green Tree Servicing, LLC ("Green Tree"), by its attorneys and pursuant to Local Rule 56.1, submits this statement of material facts as to which there is no genuine issue and which entitle Green Tree to summary judgment as a matter of law.

### The Parties

1.  Plaintiffs, Jeffrey ("Jeff") and Katarzyna ("Katie") Modica (collectively, "Plaintiffs") are natural persons residing at 240 South Villa Avenue, Addison, Illinois ("the Property"). (Complaint, ¶ 4.)

2.  Defendant, Green Tree, is a limited liability company with its principal office located in St. Paul, Minnesota. (Complaint, ¶ 5.)

### Jurisdiction and Venue

3.  Jurisdiction of this Court arises under 28 U.S.C. §§ 1331 and 1337 because Plaintiffs assert claims pursuant to 47 U.S.C. § 227. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. Venue is proper in this judicial

district under 28 U.S.C. § 1391 because Plaintiffs reside and Green Tree transacts business in the Northern District of Illinois. (Complaint, ¶¶ 1-4.)

## The Loan

4. Jeff purchased the Property in 2000 and Plaintiffs and their family have lived there since then. To make that purchase, Jeff entered into a promissory note and first mortgage with Countrywide in the amount of approximately $198,000. That first loan was subsequently taken over by Bank of America and then Bayview, and is not at issue here. (Deposition of Jeffrey Modica, attached hereto as Exhibit A, 9:17-10:7; Deposition of Katarzyna Modica, attached hereto as Exhibit B, 8:6-16.)

5. In May 2007, Jeff obtained a second mortgage loan from Countrywide in the amount of approximately $51,000 ("the Loan"). (Ex. A, Jeff Dep., 10:8-11:3; Ex. B, Katie Dep., 8:21-9:4.) Jeff's payments on the Loan were due on the first of each month. (Declaration of Karen Ferguson, attached hereto as Ex. C, ¶ 3.)

## The Bankruptcy

6. On June 6, 2008, shortly after obtaining the Loan, Plaintiffs filed for Chapter 7 bankruptcy. At that time, Jeff was current on the Loan and it was Plaintiffs' intent to stay in their home at the Property. (Ex. A, Jeff Dep., 11:4-12,12:19-13:1; Ex. B, Katie Dep., 10:16-11.)

7. On September 9, 2008, Plaintiffs were granted a discharge of all dischargeable debts by the bankruptcy court. (Complaint, ¶ 11.)

8. After their bankruptcy, Bayview contacted Plaintiffs about modifying their Bayview loan. Plaintiffs had no issue with Bayview contacting them and did not view that contact as a violation of the discharge order entered in their bankruptcy. Plaintiffs entered into a loan modification with Bayview when Bayview approached them. (Ex. A, Jeff Dep., 15:2-16:6.)

9. Although they had gone through bankruptcy, Plaintiffs understood that the Loan could be foreclosed upon in the event payments were not made on the Loan. After the discharge, Jeff made monthly payments on the Loan throughout 2009, 2010, and into 2011 (first to Countrywide and then to Green Tree, which took over servicing of the Loan effective March 11, 2011). (Ex. A, Jeff Dep., 16:16-19:9; Ex. B, Katie Dep., 11:5-24; Ex. C, Ferguson Dec., ¶ 4.)

10. Jeff's March payment was short by $27. On March 21, 2011, a Green Tree representative spoke with Jeff. During that call, Jeff confirmed to Green Tree that he intended to keep ownership of the Property, explained that his payment had been short due to "excessive obligations," and promised a payment. (Ex. C, Ferguson Dec., ¶¶ 4 and 6 and Ex. 1 thereto, entry for 3/21/11.)

11. On September 10, 2011, Jeff made what would be his last payment on the Loan. (Ex. C, Ferguson Dec., ¶ 7.) Plaintiffs understood that Green Tree could foreclose on their mortgage, but they continued to live at the Property and wanted to keep the Property. (Ex. A, Jeff Dep., 20:9-12, 20:17-21, 21:4-7; Ex. B, Katie Dep., 13:8-12; 13:15-17.)

12. After Jeff missed his October payment, Green Tree attempted to contact him by telephone to determine his intent with respect to the Property, leaving voicemails asking Jeff to call. On October 24, 2011, at approximately 1:18 p.m., a Green Tree representative spoke with Jeff. Jeff confirmed his intent to retain the Property and told the representative that he thought his spouse had mailed a double payment of $793, but he was not sure "sure on specifics." (Ex. C, Ferguson Dec., ¶¶ 4 and 7 and Ex. 1 thereto, entry for 10/24/11.)

13. Five minutes later, Jeff called Green Tree and spoke with a different representative, Karen Ferguson, who was the Green Tree representative assigned to Jeff's account. Again, Jeff confirmed his intent to retain the Property, told Ferguson that his wife sent

3

in a double payment and that he would check with her and call back that afternoon. Jeff told Green Tree that Green Tree could call him on his cell phone number, 630-625-2000. (Ex. C, Ferguson Dec., ¶¶ 4 and 7 and Ex. 1 thereto, entry for 10/24/11.)

14. In fact, Katie had not sent in a double payment and Jeff did not call Green Tree back that afternoon. In the days that followed, having not heard further from Jeff, Green Tree's Ferguson attempted to contact him at the number he had given her. Jeff did not answer those calls. Sometimes Ferguson left messages, asking Jeff to call; sometime she did not. (Ex. C, Ferguson Dec., ¶¶ 4 and 8 and Ex. 1 thereto.)

15. Every time Ferguson left a voicemail, she said (as Jeff described it) only: "Jeff, this is Katie Ferguson from Green Tree. You need to give me call back at this number. I think she left her extension. It is very important." (Ex. A, Jeff Dep., 34:7-35:6; Ex. B, Katie Dep., 19:3-12.)

16. After unsuccessful attempts to contact Jeff, Ferguson located one of Plaintiffs' neighbors and left a voicemail for her, asking her to ask Jeff to call Green Tree. (Ex. C, Ferguson Dec., ¶¶ 4 and 9 and Ex. 1 thereto, entry for 11/12/11.) This prompted Katie to call Ferguson on November 12. At that time, Plaintiffs wanted to stay in their home. Katie asked why Green Tree had called Plaintiffs' neighbor; Ferguson explained that she was trying to get hold of Jeff. There was no substantive conversation about the Loan or Plaintiffs' bankruptcy. Katie then called Ferguson again on November 12. The contents of the second call were essentially the same as the first. (Ex. B, Katie Dep., 18:17-19, 20:2-4, 20:14-18, 21:3-15, 22:1-6, 22:24-23:2, 25:2-9.) The two calls on November 12, 2011 were the only times Katie actually spoke with a Green Tree representative. (Ex. B, Katie Dep., 18:13-16, 26:9-17.)

17. As no payments were forthcoming, Ferguson continued to attempt to contact Jeff and sometimes Katie to determine Plaintiffs' intent with respect to the Property. (Ex. C, Ferguson Dec., ¶¶ 4 and 10 and Ex. 1 thereto.) Jeff finally called Green Tree in response to Ferguson's voicemails on December 20, 2011; that call lasted *approximately 54 minutes* and was the only conversation that Jeff recalls having with Green Tree. Jeff stated that he was calling to explain why he had not been paying the Loan. He confirmed his intent to keep the Property and discussed with Ferguson and then with her manager a possible loan modification and ways Green Tree could work with him to bring the loan current. (Ex. A, Jeff Dep., 31:24-32:16, 35:7-13; Ex. C, Ferguson Dec., ¶¶ 4, 10-11 and Ex. 1 thereto, entries for 12/20/11.)

18. In follow-up to those discussions, Green Tree sent Jeff a loan modification package on December 22, 2011. (Ex. C, Ferguson Dec., ¶¶ 4 and 11 and Ex. 1 thereto, entry for 12/22/11.) In the months that followed, Plaintiffs continued to live at the Property but made no payments to Green Tree. Ferguson continued her attempts to contact Jeff (directly or through Katie) to determine his intent with respect to the Property, again sometimes leaving voicemails asking him to call. Jeff did not return any of those voicemails. (Ex. C, Ferguson Dec., ¶ 4 and 12 and Ex. 1 thereto.)

19. Jeff never told Green Tree words to the effect, "Stop calling. We don't want the house." He did not speak with Green Tree again after December 20, 2011. (Ex. A, Jeff Dep., 38:2-6, 48:17-22.)

20. Katie did not answer any of the calls that Green Tree made to her, nor did she return any of the voicemails left for her or ask Jeff to do so. (Ex. B, Katie Dep., 19:13-15, 28:16-21, 43:14-21.) The two calls on November 12, 2011 were the only times Katie actually spoke with a Green Tree representative. (Ex. B, Katie Dep., 18:13-16, 26:15-17.)

21. Katie alleges that in early March 2012, Green Tree sent a representative to the Property to determine whether the Property was still occupied and what Jeff intended to do. Katie answered the door; Jeff was not home. The Green Tree representative handed Katie a paper which had Green Tree's logo on it. He said, "When Jeff gets home, have him call me – it's very important." Then the man left. He did not yell or threaten Katie. (Ex. B, Katie Dep., 37:17-40:2, 41:6-7, 41:20-22.)

22. Plaintiffs have no notes of conversations with Green Tree, nor recordings of any telephone calls or voicemails. (Ex. A, Jeff Dep., 26:11-24, 27:4-6; Ex. B, Katie Dep., 15:19-23.)

### **Green Tree's Phone Systems**

23. During the period at issue in this case (2011-2013), Green Tree used two separate methods to contact customers by telephone: (1) calls made manually by calling agents at Green Tree's call centers; and (2) calls made by Green Tree's predictive dialing system. (Declaration of Roger Sparks, attached hereto as Exhibit D, ¶ 3.)

24. With respect to manual calls, the calling agents operated computers with a custom-built account user interface known as "UCSe." Those computers did not store customer information or have software that would enable the computer to produce telephone numbers to be called using a random or sequential numerator generator, and to then call those numbers. Moreover, the call center computers did not have the capability to perform predictive dialing, and the call center agent had no ability to initiate predictive dialing. (Ex. D, Sparks Dec., ¶ 4.)

25. Rather, for any given loan, the calling agent, using the UCSe interface, accessed information regarding the loan (including phone numbers when applicable) that resided on an IBM 9117, Model MMD server ("the Server") which was located in St. Paul, Minnesota. (Ex. D, Sparks Dec., ¶ 5.)

26. If the agent determined that a call to a customer was warranted by the circumstances then existing, the agent manually placed a call to the customer by either dialing the customer's phone number on the agent's telephone, using the keypad on the agent's computer to dial the customer's number, or using the computer mouse to click on a telephone number that was displayed on the computer screen (which number was retrieved from the Server, where that information was stored). In the latter two cases, after action by the agent, the agent's computer would cause the agent's telephone to dial the customer's number and the call would proceed as if the agent had personally dialed the number on the telephone. (Ex. D, Sparks Dec., ¶ 6.)

27. After the call with the customer was completed and the agent moved on to another loan, all information relating to the prior loan would disappear from the agent's computer; customer information was not stored on the agent's computer. (Ex. D, Sparks Dec., ¶ 7.)

28. In sum, the process for manually dialing required four components (*i.e.*, a live calling agent, the agent's computer, the server, and a telephone), and the process of dialing had to be initiated by the calling agent making a decision to call the customer and then taking action to cause the number to be dialed. (Ex. D, Sparks Dec., ¶ 8.)

29. During the relevant period, Green Tree also contacted customers using a predictive dialer known as the Aspect Unified IP Version 6.6 Service Pack 2 ("Dialer") to conduct "Dialer campaigns." Green Tree's Dialer was a combination of hardware and software located in Tempe, Arizona and St. Paul, Minnesota, separate and apart from the server and the computers located in the calling centers. (Ex. D, Sparks Dec., ¶ 9.)

30. For the Dialer to make calls, a Green Tree employee first determined what criteria would be used to select the phone numbers that would be dialed as part of a Dialer campaign.

The selected numbers were transferred in a data file from the Server to the Dialer, which then dialed those numbers. (Ex. D, Sparks Dec., ¶ 10.)

31. For a Green Tree agent to participate in phone calls initiated by the Dialer (*i.e.*, a Dialer campaign), it was necessary for the agent to log on to the Dialer from the agent's computer. Once the agent logged on to the Dialer, the Dialer would connect via telephone line to the agent's telephone. (Ex. D, Sparks Dec., ¶ 11.)

32. If the Dialer detected that a live person had answered the call, the Dialer would transfer the call to an available agent (*i.e.*, an agent who had taken affirmative action to log onto the Dialer and who was not otherwise engaged in speaking with another customer), typically in Green Tree's Front End Collection Group or in another group that had logged into the Dialer. Occasionally, recorded messages were left by the Dialer instead of transfer of the call to an agent. (Ex. D, Sparks Dec., ¶ 12.)

33. Individual calling agents did not have the ability to set up a Dialer campaign from their computers or to otherwise initiate action by the Dialer. On occasion, a regional manager set up a Dialer campaign for calling agents in his region. If a regional manager decided that a Dialer campaign was needed, he set up the campaign by providing the account criteria for the accounts to be called. Calling agents within the region then logged onto the Dialer and the Dialer connected via phone line to the agents' phones. The Dialer then began its work and connected answered calls to available representatives. The use of the Dialer at the regional level was left to the decision of the regional managers. (Ex. D, Sparks Dec., ¶ 13.)

34. During the relevant period, Katie's cell phone number was (630) 625-2342 and Jeff's cell phone number was (630) 625-2000. (Debtors' Response to Green Tree Services LLC's Interrogatories, attached hereto as Ex. E, No. 2.)

35. No calls were made by the Dialer to Katie's cell phone. Six calls were made to Jeff's cell phone by the Dialer, at the dates and times set forth below:

| DATE | TIME |
|------|------|
| 10/18/11 | 9.36.24 |
| 10/19/11 | 7.20.00 |
| 10/21/11 | 6.16.30 |
| 10/21/11 | 13.27.32 |
| 10/24/11 | 6.56.06 |
| 10/24/11 | 13.18.03 |

All other calls made to Jeff's cell phone and all calls made to Katie's cell phone were thus made manually by a Green Tree representative. (Ex. D, Sparks Dec., ¶¶ 14-18 and Ex. 1 thereto.)

/s/ Marshall L. Blankenship
One of the attorneys for defendant, Green Tree Servicing LLC

James D. Adducci
Marshall L. Blankenship
ADDUCCI, DORF, LEHNER,
 MITCHELL & BLANKENSHIP, P.C.
150 North Michigan Avenue
Suite 2130
Chicago, IL  60601
(312) 781-2807

# **CERTIFICATE OF SERVICE**

The undersigned, one of the attorneys for Defendant, certifies that on January 13, 2015, he caused a copy of the foregoing to be served by U.S. Mail on:

>Mohammed Badwan, Esq.
>Matthew Hector, Esq.
>Daniel J. McGarry
>Mara A. Baltabols
>Sulaiman Law Group, Ltd.
>900 Jorie Boulevard, Suite 150
>Oak Brook, IL  60523

/s/ Marshall L. Blankenship