# EXHIBIT B

# In The Matter Of:

*In re*
*Jeffrey R. Modica, et al., Debtors*

---

*KATARZYNA A. MODICA*
*December 18, 2013*

---

*Bistany Reporting Service*
*100 North LaSalle Street*
*Suite 1600*
*Chicago, Illinois  60602*
*e-mail:  info@bistanyreporting.com*

Original File K_Modica_121813_final.txt
**Min-U-Script® with Word Index**

## Page 1

```
 1          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   In re:                 ) Chapter 7
 4                          )
     JEFFREY R. MODICA,      )
 5   KATARZYNA A. MODICA     ) Case No. 08-14633
     Katie Modica,          )
 6                          ) Honorable Judge Donald R.
            Debtors.        ) Cassling
 7

 8

 9

10          The deposition of KATARZYNA A. MODICA,

11   taken in the above-entitled cause before Denielle P.

12   Mathys, CSR, and Notary Public within and for the

13   County of Kane and State of Illinois, taken pursuant

14   to the Federal Code of Civil Procedure for the

15   United States Bankruptcy Court, Northern District of

16   Illinois, Eastern Division, at 150 North Michigan

17   Avenue, Suite 2130, in the City of Chicago,

18   Illinois, on December 18, 2013, at the hour of

19   11:07 a.m.

20

21

22

23

24
```

## Page 2

```
 1          A P P E A R A N C E S:

 2

 3   ADDUCCI, DORF, LEHNER, MITCHELL &
        BLANKENSHIP, P.C.
 4   BY:  MR. MARSHALL L. BLANKENSHIP
        150 North Michigan Avenue, Suite 2130
 5        Chicago, Illinois  60601
         (312) 781-2800
 6        mblankenship@adlmb.com

 7          On behalf of Green Tree
            Servicing LLC;
 8

     SULAIMAN LAW GROUP, LTD.
 9   BY:  MR. MOHAMMED O. BADWAN
        900 Jorie Boulevard, Suite 150
10        Oak Brook, Illinois  60523-3810
         (630) 575-8181
11        mbadwan@sulaimanlaw.com

12          On behalf of the Debtors.

13

14

15

16

17

18

19

20

21

22

23

24
```

## Page 3

```
 1                 I N D E X

 2   WITNESS EXAMINATION      DX      CX     RDX    RCX

 3   KATARZYNA A. MODICA

 4   BY MR. BLANKENSHIP       4              59

 5   BY MR. BADWAN                    44

 6

 7

 8            E X H I B I T S

 9   DEPOSITION EXHIBITS               FIRST REFERENCE

10   J. Modica Exhibit No. 1                     7

11   J. Modica Exhibit No. 2                    16

12

13

14

15

16

17

18

19

20

21

22

23

24
```

## Page 4

```
 1          KATARZYNA A. MODICA,
 2   called as a witness, being first duly sworn, was
 3   examined and testified as follows:
 4          DIRECT EXAMINATION
 5   BY MR. BLANKENSHIP:
 6      Q   Will you state your name.
 7      A   Sure, Katarzyna Modica.
 8          MR. BLANKENSHIP: Let the record reflect
 9   that this is the deposition of Katarzyna Modica
10   taken pursuant to notice, agreement of the parties,
11   and the applicable Federal and Bankruptcy rules.
12   BY MR. BLANKENSHIP:
13      Q   Ms. Modica, my name is Marshall
14   Blankenship.  I represent Green Tree.  I'm going to
15   be asking you a series of questions about your
16   motion here against Green Tree.  Have you ever been
17   deposed before?
18      A   No.
19      Q   If you don't understand a question, please
20   let me know, and I'll try to rephrase it so you can
21   understand it, okay?
22      A   Okay.
23      Q   We can't speak at the same time since the
24   court reporter is typing it all down, so I ask that
```

Page 5

1  you let me finish my question before you give your
2  answer, okay?
3     A   Okay.
4     Q   Okay.  If you need to take a break, just
5  let me know, okay?
6     A   Okay.
7     Q   Do you live with your husband at 240 South
8  Villa Avenue in Addison, Illinois?
9     A   Yes.
10    Q   What is your birthday?
11    A   7-3-83.
12    Q   That makes me feel old.
13        And you're married to Jeff Modica?
14    A   Yes.
15    Q   How long have you been married?
16    A   Eight years.
17    Q   You have three sons?
18    A   Yes.
19    Q   What's your highest level of education?
20    A   Some college.
21    Q   Where did you go to college?
22    A   Sanford-Brown.
23    Q   How long did you go?
24    A   Two years.

Page 6

1     Q   And when did you finish there?
2     A   2011.
3     Q   Okay.  Are you presently employed?
4     A   No.
5     Q   Have you been employed since your
6  Sanford-Brown days?
7     A   Yes.
8     Q   What was your last job?
9     A   Medical assisting at Northwest
10 Rheumatology.
11    Q   What period of time did you hold that
12 position?
13    A   About a year and a half.
14    Q   When was that?
15    A   It was from March of 2012 to October of
16 this year.
17    Q   What did you do before that?
18    A   Stayed at home with the kids.
19    Q   Okay.  Did you do anything to prepare for
20 this deposition?
21    A   Not really, just looked over some
22 paperwork.
23    Q   What paperwork did you look over?
24    A   The --

Page 7

1     Q   The motion?
2     A   Uh-huh.
3        (J. Modica Exhibit No. 1
4        previously marked for identification.)
5  BY MR. BLANKENSHIP:
6     Q   I'm going to show you what we've marked as
7  Exhibit 1.  Do you recognize that as the motion that
8  you filed here?
9     A   Yes.
10    Q   And you looked over that in preparation
11 for today?
12    A   Yes.
13    Q   Did you look at any other documents in
14 preparation for today?
15    A   No.
16    Q   Did you speak with anyone in preparation
17 for today?
18    A   My husband.
19    Q   Anyone else?
20    A   No.
21    Q   Did you speak with your counsel?
22    A   Oh, yes, I spoke with them.
23    Q   I don't want to know the contents of your
24 conversation.

Page 8

1     A   Yes, yes, yes.
2     Q   And when was that?
3     A   Yesterday.
4     Q   For how long?
5     A   About an hour.
6     Q   Now, you moved into the property in
7  Addison in around 2000; is that right?
8     A   Yes.
9     Q   And are you on the title to the property?
10    A   No.
11    Q   And I'm trying to short-cut here since I
12 got a lot of this from your husband.
13    A   Yes.
14    Q   You obtained an initial mortgage for the
15 property from Countrywide?
16    A   Yes.
17    Q   And were you a signatory on that loan?
18    A   No.  We weren't married yet so . . .
19    Q   Okay.  And then when did you get married?
20    A   We got married in 2006.
21    Q   And then in May of 2008 you obtained a
22 second mortgage from Countrywide?
23    A   Yes.
24    Q   And that was in the amount of about

Page 9

1  $51,000?
2     A   Yes.
3     Q   Were you a signatory on that loan?
4     A   No.
5     Q   And then you filed for bankruptcy on
6  June 6, 2008?
7     A   Uh-huh.
8     Q   Okay.  And that was about a month after
9  you obtained that second mortgage from Countrywide?
10    A   I believe so.
11    Q   Do you recall when you retained the
12 Sulaiman Law Group to represent you?
13    A   Not exactly, maybe a year ago or so, a
14 little over a year.
15    Q   Okay.  In the approximately fall of 2012?
16    A   Yes.
17    Q   What prompted you to retain them at that
18 time?
19    A   Just searching for options regarding
20 foreclosure on the house.
21    Q   Was someone threatening foreclosure at
22 that time?
23    A   Bank of America was.
24    Q   And that resulted ultimately in you

Page 10

1  getting a loan modification of the first mortgage?
2     A   Yes.
3     Q   And I understand that just kind of was
4  finalized within the last few months?
5     Q   At the time you filed for bankruptcy, you
6  were current on both of your loans?
7     A   Yes.
8     Q   And when you filed for bankruptcy, it was
9  your intent to stay in your home?
10    A   Yes.
11    Q   And you received your discharge from the
12 bankruptcy court on September 9, 2008?
13    A   Yes.
14    Q   And you understood that Countrywide's
15 mortgage lien on the Addison property was not
16 affected by your bankruptcy?
17    A   I'm not sure.
18       MR. BADWAN: Objection.  You're asking her
19 for a legal conclusion.
20 BY MR. BLANKENSHIP:
21    Q   No, I'm asking for your understanding.
22       MR. BLANKENSHIP: Yes, sir.  Go ahead.
23       MR. BADWAN: Can I rephrase into something

Page 11

1  I think she can --
2        MR. BLANKENSHIP: No, I'll do it.
3        MR. BADWAN: Okay.
4  BY MR. BLANKENSHIP:
5     Q   You understood that Countrywide could
6  still pursue foreclosure of the mortgage in the
7  event payments were not made on the mortgage, right?
8     Q   And you understood that if Countrywide
9  pursued foreclosure, it could force you from your
10 home, right?
11    A   Yes.
12    Q   And you understood if you continued to
13 make regular monthly payments to Countrywide,
14 Countrywide would not foreclose?
15    A   Right.
16    Q   And then after your discharge, in fact you
17 continued to make regular monthly payments of
18 approximately $375 a month on your loan?
19    A   Yes.
20    Q   And you made those payments so Green Tree
21 would not -- or Countrywide would not foreclose, and
22 you could stay in your home?
23    A   Right.

Page 12

1     Q   And you did the same with Bank of
2  America --
3     A   Yes.
4     Q   -- you made payments on the first mortgage
5  every month?
6     A   Yes.
7     Q   Do you recall the servicing of the
8  Countrywide loan being transferred to Green Tree at
9  some point?
10    A   Yes.
11    Q   And was that approximately in March of
12 2011?
13    A   Yes.
14    Q   And you continued to make the regularly
15 monthly payments to Green Tree as well, correct?
16    A   Yes.
17    Q   And then you made your last monthly
18 payment to Green Tree in September of 2011?
19    A   Yes.
20    Q   And you also made your last payment to
21 Bank of America on the first mortgage?
22    A   Yes.
23    Q   Why did you stop making payments on your
24 mortgages in September 2011?

Page 13

1    A    Drastic income reduction.
2    Q    What was the cause of that?
3    A    I stopped working full time to stay home
4  with the kids.
5    Q    How much had you been making prior to
6  stopping work?
7    A    About 700 a week.
8    Q    And when you stopped making the payments,
9  did you have an understanding that Green Tree or
10  Bank of America could foreclose on their mortgages
11  and toss you out of your house?
12    A    Yes.
13    Q    Did that trouble you?
14    A    Yes.
15    Q    Were you willing to leave your house at
16  that point?
17    A    No.
18    Q    After you filed for bankruptcy, did you
19  ever tell Green Tree that you wanted to stay in your
20  home?
21    A    No, I don't think so.
22    Q    Did you ever tell Green Tree that you
23  didn't want Green Tree to foreclose?
24    A    I don't think so.  I don't believe so.

Page 14

1    Q    Did you ever attempt to arrange a payment
2  schedule with Green Tree?
3    A    No.
4    Q    Did you ever discuss loan modification
5  with Green Tree?
6    A    No.
7    Q    Okay.  I showed you your motion.  Did you
8  review Exhibit 1 before it was filed?
9    A    I don't recall.
10    Q    You looked at it yesterday?
11    A    Well, I looked at it yesterday, yes.
12    Q    And are the statements in Exhibit 1
13  truthful and correct?
14    A    Yes.
15    Q    If you look at paragraph 22, please.  You
16  state, "Immediately after debtors stopped paying the
17  subject debt, Green Tree began calling them
18  requesting payment.  Green Tree continued to call
19  even after the Debtors advised them of the
20  bankruptcy.
21        After their bankruptcy discharge, in
22  total, Debtors received over one hundred (100) calls
23  from a representative of Green Tree by the name of
24  'Katie Ferguson'."

Page 15

1        My first question is, do you have any
2  records, any documentation, notes, recordings of any
3  of the calls that you received from Green Tree?
4    A    Just the phone -- phone records.
5    Q    Okay.  Your phone -- your cell phone
6  bills?
7    A    Yes.
8    Q    And those bills would show dates when you
9  actually had conversations with someone at Green
10  Tree?
11    A    Yes.
12    Q    And am I correct in understanding that
13  those phone records do not show calls from Green
14  Tree that did not result in a conversation?
15    A    Right.
16    Q    And if Green Tree left a voicemail, that
17  also would not be shown in those phone records?
18    A    Right.
19    Q    You don't have any notes of any
20  conversations with anyone at Green Tree?
21    A    No.
22    Q    And you didn't save any of the voicemails?
23    A    No.
24

Page 16

1        (J. Modica Exhibit No. 2
2         previously marked for identification.)
3  BY MR. BLANKENSHIP:
4    Q    Look at what we've previously marked as
5  Modica Exhibit 2.  Do you recognize that as your
6  responses to Green Tree's interrogatories?
7    A    Yes.
8    Q    And did you review Exhibit 2 before it was
9  finalized and served to Green Tree?
10    A    Yes.
11    Q    And are the answers in Exhibit 2 truthful
12  and accurate?
13    A    Yes.
14    Q    If you look at No. 6 where we ask you for
15  various information about telephone calls that you
16  contend violate the discharge order, you state about
17  halfway down in your response that, ". . . Debtors
18  state that from late October 2011 to late May 2012,
19  they received up to 5 calls per day from Katie
20  Ferguson."
21        Did you -- I'm trying to distinguish
22  between what happened to you and what happened to
23  your husband.  So did you personally receive between
24  one and five calls each day between late

Page 17

1  October 2011 and late May 2012?
2     A   Yes.
3     Q   And that was on your cell phone?
4     A   Yes.
5     Q   And your number for that cell phone was
6  (630)625-2342?
7     A   Yes.
8     Q   Okay.  You don't have any records of those
9  calls, correct?
10     A   There's -- there is a record of a couple
11  of phone calls, yes.
12     Q   Couple, okay.  Do you have any records
13  that show five calls in a single day?
14     A   No.
15     Q   How many actual phone calls with Green
16  Tree resulted in a conversation between you and
17  Green Tree?
18     A   I would -- a handful approximately.
19     Q   Six do you think?
20     A   Between five and six.
21     Q   Five and six.  And you don't have a land
22  line at your house?
23     A   No.
24     Q   Okay.  And back to your motion, Exhibit 1,

Page 18

1  paragraph 27 you allege that, "On November 12, 2011,
2  after Green Tree contacted the Debtors' neighbor,
3  the Debtors called Katie Ferguson and spoke to her
4  twice that day."
5        Was it you that called Katie Ferguson
6  twice on November 12, 2011?
7     A   Yes.
8     Q   Do you recall any conversations between
9  you and Green Tree between your discharge and
10  November 12, 2011?
11     A   When the initial calls started, it was my
12  husband who spoke with them.
13     Q   Okay.  So you didn't have any
14  conversations with Green Tree prior to November 12,
15  2011?
16     A   No.
17     Q   And you personally spoke with Ferguson on
18  November 12, 2011?
19     A   Yes.
20     Q   Did you receive any calls from Green Tree
21  between the discharge on September 8th and
22  November 12, 2011, on your cell phone that did not
23  result in a conversation?
24     A   Yes.

Page 19

1     Q   How many?
2     A   Approximately three a day.
3     Q   Okay.  And did those calls result in
4  voicemails?
5     A   A couple, yeah.
6     Q   And what was the content of the
7  voicemails, the best you can recall?
8     A   She stated her name, where she was calling
9  from, and that it was very important that we give
10  her a call back.
11     Q   Anything else?
12     A   Uh-uh.
13     Q   And did you call back in response to any
14  of those voicemails?
15     A   No.
16     Q   Why not?
17     A   Because my -- we knew -- my husband spoke
18  with her previously, and when three times a day
19  calling each of our phones, we just decided not
20  to -- just to stop answering the phone calls.
21     Q   You didn't call back and say -- to any of
22  these voicemails and say, "Please stop calling me"?
23     A   My husband did, yes, he did.  He spoke
24  with her on a number of occasions.  On

Page 20

1  November 12th, I personally called her back.
2     Q   So you initiated the first call with
3  Ferguson on November 12, 2011, right?
4     A   Yes.
5     Q   And was anyone else on the line besides
6  you and Ferguson?
7     A   No.
8     Q   And was anyone else present with you when
9  you were calling?
10     A   No.
11     Q   Okay.  Do you know what time that first
12  call happened on November 12th?
13     A   It was in the morning.
14     Q   As of November 12, 2011, did you want to
15  avoid foreclosure on your house?
16     A   Did I want to . . .
17     Q   Did you want to stay in your house?
18     A   Yes.
19     Q   How long did that first call on
20  November 12th last?
21     A   Two minutes.
22     Q   Okay.  And why did you call Ferguson?
23     A   My neighbor advised me the night before
24  that she had called and left a message on her

Page 21

1 answering machine, and I just wanted to clarify why
2 they were calling my neighbor.
3    Q   Okay. Tell me as best you can during that
4 first call on November 12th, the two-minute call,
5 what you said to Ferguson and what she said to you.
6    A   Well, I asked her originally why she
7 called my neighbor, and she said, well, we're trying
8 to get ahold of you. And I didn't understand. You
9 know, I tried to explain to her the best I could
10 that I didn't understand how she was calling a
11 neighbor that they didn't know whether I had contact
12 with or not.
13    Q   Okay. Do you recall anything else from
14 that first conversation?
15    A   Uh-uh.
16    Q   Did Ms. Ferguson reply to you when you
17 explained that?
18    A   Yeah. She said that they were just trying
19 to get ahold of us, and it was very important.
20    Q   And how did that call end?
21    A   We just hung up. She said that they're
22 allowed to call whoever they need to call in order
23 to get ahold of the person they're trying to reach,
24 which would be my husband.

Page 22

1    Q   Okay. So you had no substantive
2 conversation about the loan itself --
3    A   No.
4    Q   -- during this call? And did you talk
5 about your bankruptcy at all during this call?
6    A   No.
7    Q   Was it purely to ask why they were calling
8 your neighbor?
9    A   Yes.
10    Q   Did the call end hostilely?
11    A   I wouldn't say hostilely. I just wanted
12 an explanation of why they were calling people in my
13 neighborhood trying to get ahold of me.
14    Q   Did you hang up on Ferguson?
15    A   No, I did not hang up on her.
16    Q   Did she hang up on you?
17    A   No.
18    Q   It just ended peacefully?
19    A   (Indicating.)
20    Q   Okay. And you don't have any notes or
21 recordings or records of the contents of that first
22 call with Ferguson?
23    A   I don't have -- no, no, I don't.
24    Q   Okay. And did you initiate the second

Page 23

1 call on November 12, 2011, to Ferguson?
2    A   Yes.
3    Q   And was anyone else on the line for that
4 call?
5    A   No.
6    Q   And was anyone else present for that call?
7    A   No.
8    Q   And what time was that call?
9    A   In the morning also.
10    Q   How long after the first call?
11    A   About 20 minutes or so.
12    Q   And how long did the second call last?
13    A   Nine minutes.
14    Q   How do you know that? Is that from your
15 phone records?
16    A   It's from my phone records, yes.
17    Q   But your phone records show an outgoing
18 call from you to Green Tree?
19    A   Yes, yes.
20    Q   What was the purpose of the second call?
21 Why did you call the second time?
22    A   Because I was advised again that she had
23 called my neighbor again on November 12th.
24    Q   Okay. So after the first call you were

Page 24

1 advised again?
2    A   Again that she had called again and left a
3 message on my neighbor's answering machine.
4    Q   And was this -- okay. Who called to tell
5 you that? Who told you that?
6    A   My neighbor. My neighbor.
7    Q   And when was that second -- this was a
8 second voicemail that was left for the neighbor?
9    A   On the land line -- on the answering
10 machine of her home, yes.
11    Q   Okay. And when was that message left with
12 your neighbor, the second one?
13    A   On the 12th.
14    Q   Did you have an understanding that that
15 voicemail on your neighbor's machine was left after
16 you had called Ferguson the first time?
17    A   Yes, it was -- I think it was made after I
18 called her the first time.
19    Q   So sometime in that 20 minutes after --
20    A   Yes.
21    Q   -- you think Ferguson called your neighbor
22 again and left a voicemail?
23    A   Uh-huh. Because my neighbor called me and
24 said there is another message on my answering

Page 25

1　machine.
2　　Q　Okay.  Again, tell me as best you can
3　everything you said to Ferguson and she said to you
4　during this second call on November 12th.
5　　A　Pretty much the same thing, just wondering
6　why she was calling my neighbor asking for
7　information in regards to any of my personal things
8　that I didn't, you know, talk about with anybody
9　else so . . .
10　　Q　What did you understand to be was the
11　voicemail that was left for your neighbor, simply
12　please have Jeff Modica call me?
13　　A　Yeah.  It's very important that you have
14　Jeff call me.  But I just wanted -- I didn't
15　understand how they would call that one neighbor to
16　try to get ahold of us not knowing whether we even
17　had contact with them or not.
18　　Q　Okay.  Did you understand that Green Tree
19　was calling your neighbor to try to contact Jeff
20　because Jeff and you weren't returning the
21　voicemails to Green Tree?
22　　A　Possibly.
23　　Q　During either of the calls on
24　November 12th, did you tell Green Tree that you

Page 26

1　wanted to stay in your house --
2　　A　No.
3　　Q　-- or words to that effect?
4　　A　No.
5　　Q　During either of the phone calls on
6　November 12th, did you tell Green Tree that a
7　payment would be made on your loan?
8　　A　No.
9　　Q　Do you recall anything else from the
10　second conversation on November 12, 2011?
11　　A　No.
12　　Q　And you don't have any notes, recordings,
13　or records of that second call?
14　　A　No.
15　　Q　Did you have occasion to speak again with
16　a representative of Green Tree?
17　　A　I did not, no.
18　　Q　Did you continue to receive voicemails
19　from Green Tree?
20　　A　Yes.
21　　Q　And you just -- when you would get a call
22　from Green Tree, would you just -- I forgot the word
23　your husband used.
24　　　MR. BADWAN: Bounce.

Page 27

1　BY MR. BLANKENSHIP:
2　　Q　Bounce the call?
3　　A　Bounce, yes.
4　　Q　You just wouldn't accept the call?
5　　A　Yes.
6　　Q　So you've only had one -- or two
7　conversations with Green Tree both that occurred on
8　November 12, 2011?
9　　A　Yes.
10　　Q　And both of those were with regard to
11　Green Tree leaving a voicemail with your
12　neighborhood --
13　　A　Yes.
14　　Q　-- neighbor?  I'm sorry.
15　　A　Yes.
16　　Q　When did you last receive a call from
17　Green Tree?
18　　A　On my phone or --
19　　Q　Yes.  Your phone, yes.
20　　A　November 12th -- or the last call that I
21　received that I did not answer?
22　　Q　Right.  Not a conversation, but just the
23　last time Green Tree called you.
24　　A　I would say April of 2011 -- 12th, I'm

Page 28

1　sorry.  2012.
2　　Q　He made the same mistake.
3　　A　I'm sorry.  I'm sorry.  2012.
4　　Q　No, that's okay.  We made the same mistake
5　earlier today.
6　　A　Okay.  Okay.  Yeah, 2012.
7　　Q　So between November 12, 2011, and
8　April 2012 you continued to receive --
9　　A　Yes.
10　　Q　-- voicemails from Ms. Ferguson?
11　　A　Yes.
12　　Q　And were those again on a daily basis?
13　　A　Yes.
14　　Q　Sometimes multiple times a day?
15　　A　Yes.
16　　Q　And you didn't return any of those
17　voicemails?
18　　A　No.
19　　Q　And did you ask your husband to return any
20　of those voicemails?
21　　A　No.
22　　Q　If you look at paragraph 30, this
23　paragraph refers to a conversation with Ferguson on
24　December 20, 2011.  That was your husband that had

Page 29

1 that conversation, correct?
2   A   Yes.
3   Q   And you didn't overhear that conversation?
4   A   No.
5   Q   Do you know anything that was said during
6 that conversation?
7   A   Just from what he explained to me.
8   Q   What did your husband explain to you about
9 the call that he had with Green Tree on December 20,
10 2011?
11   A   That Katie Ferguson asked for a payment,
12 any type of payment.  And my husband, while he was
13 talking to her, she had put her supervisor on the
14 line, and then my husband spoke with her supervisor.
15   Q   Okay.  Do you recall anything else your
16 husband told you about that conversation?
17   A   Regarding -- the supervisor, he had said
18 if you have filed for bankruptcy, how come you are
19 unable to pay the loan?
20   Q   Do you recall anything else?
21   A   No.
22   Q   What was your husband's demeanor after he
23 got off the --
24   A   Upset.

Page 30

1   Q   Describe to me how you concluded that he
2 was upset.
3   A   A lot of things going on and then having
4 somebody insult you pretty much.
5   Q   I'm trying to get -- how did his -- how he
6 manifest the fact that he was upset?
7   A   He told me he was very upset.
8   Q   Okay.  That's what I was looking for.
9   A   Okay.
10   Q   How long did he remain upset?
11   A   Until the next morning.
12   Q   Did you have any discussions at that time
13 about what you should do in response to Green Tree's
14 calls?
15   A   Yes, we did.
16   Q   What?
17   A   Just -- you know, we didn't know what to
18 do.  It was just a lot going on at one time, and
19 then having, you know, that hang over your head that
20 somebody would call you three times a day to
21 collect, you know, it just was very upsetting to us.
22   Q   Well, you didn't really know why they were
23 calling since you didn't return the calls, right?
24   A   Well, my husband had conversations with

Page 31

1 them prior, but just having somebody call you three
2 times a day is overwhelming.
3   Q   But not enough for you to call back and
4 say why are you calling me three times a day?
5   A   After a while, you just -- you know, it's
6 very -- it's just overwhelming.  At a certain point,
7 it just becomes overwhelming to have to answer three
8 phone calls every single day from the same person.
9   Q   But you didn't answer any of the calls.
10 You would always bounce them, right?
11   A   Well, yes, I would.
12   Q   And just so I'm clear, this was on your
13 cell phone, so you always knew when it was ringing.
14 It's not like you were not home and then got home to
15 a voicemail.  You knew the call was coming --
16   A   Yes.
17   Q   -- and you chose to ignore it?
18   A   Yes.
19   Q   Okay.  In paragraph 25 you allege that
20 Ms. Ferguson called both of the debtors' parents
21 inquiring about the debtors?  And who are your
22 parents?
23   A   Halina Kuzianik.
24   Q   And who are your husband's parents?

Page 32

1   A   Margaret Pangallo.
2   Q   How do you know that Green Tree called
3 Margaret Pangallo?
4   A   She wrote down every time that they called
5 and let us know with the name, the institution, and
6 the phone number.
7   Q   And did she tell you or do you only know
8 because she told Jeff?
9   A   She told Jeff.
10   Q   Okay.
11   A   Yes.
12   Q   So you haven't had any conversations with
13 Margaret Pangallo about the calls from Green Tree to
14 her?
15   A   No.
16   Q   You only know about those calls from what
17 Jeff told you?
18   A   Uh-huh.
19   Q   And what he told you is that she would
20 write -- she wrote down that Green Tree had called
21 and wanted him to call her back?
22   A   Yes.
23   Q   How many times did you understand Green
24 Tree to have called Margaret Pangallo?

In re
Jeffrey R. Modica, et al., Debtors

KATARZYNA A. MODICA
December 18, 2013

**Page 33**

1    A   At least twice.
2    Q   Do you know if Jeff called Green Tree back
3  in response to the messages left with Margaret
4  Pangallo?
5    A   I don't know.
6    Q   And how do you know Green Tree called
7  Halina?
8    A   My mom told me, yes.
9    Q   How many times did Green Tree call your
10  mom?
11    A   At least twice.
12    Q   Do you know when those calls were?
13    A   I'm not exactly sure.
14    Q   Were they before your call with Green Tree
15  on November 12, 2011?
16    A   I think it might have been after.
17    Q   Okay.  And what did Halina tell you
18  that -- did she actually speak with someone from
19  Green Tree --
20    A   Yes.
21    Q   -- or did she just receive voicemails?
22    A   Yes.
23    Q   She spoke with them?
24    A   Uh-huh.

**Page 34**

1    Q   And what did Halina tell you Green Tree
2  had said during her conversations with Green Tree?
3    A   That again stated the name; that they were
4  calling from Green Tree; and that it was very
5  important they get ahold of one of us.
6    Q   And you didn't call Green Tree in response
7  to any of the conversations your mother had with
8  Green Tree, correct?
9    A   No.
10    Q   And your husband didn't either, correct?
11    A   No.
12    Q   Did you have any discussion with your
13  mother about the calls from Green Tree?
14    A   Yes.
15    Q   What?
16    A   She just wanted to know who they were and
17  why they were calling her.
18    Q   And what did you tell her?
19    A   I just said it's our mortgage, and they're
20  just calling to get ahold of us.
21    Q   Okay.  Did you tell her you weren't
22  current on your mortgage?
23    A   No.
24    Q   Did your parents know about the

**Page 35**

1  bankruptcy?
2    A   No.
3    Q   Did Jeff's parents know about the
4  bankruptcy?
5    A   No.
6    Q   Did Jeff's parents know that you weren't
7  current on your mortgage?
8    A   No.
9    Q   Have you seen any documents -- you
10  indicated that Margaret Pangallo would write down
11  who called.  Have you actually seen any documents
12  that she -- where she wrote down the calls?
13    A   At the time of the calls, yes.
14    Q   Okay.  Do those documents still exist?
15    A   I don't have them.
16    Q   Do you know if they still exist?
17    A   I don't.
18    Q   Okay.  And did your mother make any
19  recordings of --
20    A   Just the name and the phone number, yes.
21    Q   And did she give that to you, those notes
22  to you?
23    A   I'm not sure.
24    Q   Okay.  So you don't know if those notes

**Page 36**

1  still exist either, then?
2    A   No, I don't.
3    Q   Okay.  Now, going back to November 12 --
4  is it November 12th?
5    A   Yeah.
6    Q   Yeah.  -- when Green Tree called your
7  neighbor, that was Donna Birmingham?
8    A   Yes.
9    Q   And do you know when the first call Green
10  Tree made to Donna Birmingham was?
11    A   I believe it was the day before -- it was
12  November 11th.
13    Q   November 11th.  And the second call to
14  Birmingham was on November --
15    A   -- 12th.
16    Q   Okay.  Did Birmingham actually speak with
17  a representative of Green Tree or were those
18  voicemails?
19    A   They were just on her answering machine.
20    Q   And she told you again that someone
21  identified themselves as calling from Green Tree.
22  They were trying to get ahold of Jeff and wanted
23  Jeff to call them back?
24    A   Yes.

Page 37

1  Q   And left a phone number?
2  A   Yes.
3  Q   Anything else?
4  A   No.
5  Q   Do you know if Birmingham took any notes
6  or made any records?
7  A   I don't. I don't.
8  Q   You're not aware of any notes?
9  A   No.
10  Q   Did you have any discussions with
11  Birmingham about the calls from Green Tree?
12  A   No.
13  Q   Are you aware of any other calls that
14  Green Tree made to anyone other than you, Jeff,
15  Birmingham, your mom, or Jeff's mom?
16  A   No.
17  Q   Okay. In paragraph 35 of Exhibit 1, you
18  allege that a representative of Green Tree sent a
19  large intimidating man to visit debtors at the
20  property. Were you there for that visit?
21  A   Yes.
22  Q   When did that happen?
23  A   March of 2012.
24  Q   Do you remember the day?

Page 38

1  A   I don't. I know --
2  Q   Do you remember early or late March?
3  A   Early March.
4  Q   First half of March?
5  A   Yeah.
6  Q   And what time of day?
7  A   Mid-morning.
8  Q   Like 10 o'clock?
9  A   Like 11 o'clock-ish, yeah.
10  Q   And I want you to walk me through what
11  happened.
12  A   Okay. I was in the living room, sitting
13  watching TV with my kids, and I saw a pickup truck
14  pull into my driveway. So I kept doing what I was
15  doing, and then there was -- my doorbell rang, so I
16  opened the door, and there was a man standing at the
17  door. And he said, "Is Jeffrey home?" I said, "No,
18  he's not." He said -- he handed me something and
19  said, "This is" -- he gave me a piece of paper and
20  said, "When Jeff gets home, you make sure that he
21  calls me right away. It's very important." And I
22  said, "Okay." And that was it. He left.
23  Q   Okay. Can you describe the man?
24  A   Tall, heavier set. He had like a goatee,

Page 39

1  brown hair.
2  Q   How tall?
3  A   Six-one. He was pretty tall.
4  Q   How heavy?
5  A   Oh, I'm so bad with weight. 220 pounds.
6  Q   Okay. And what was his race?
7  A   White.
8  Q   White.
9  A   He was white.
10  Q   And he asked if Jeff was home?
11  A   Yes.
12  Q   And you said no?
13  A   Right.
14  Q   And handed you something?
15  A   Uh-huh.
16  Q   And said when Jeff gets home, have him
17  call me. It's very important?
18  A   Uh-huh.
19  Q   And then he left?
20  A   Uh-huh.
21  Q   What did he hand you?
22  A   A piece of paper.
23  Q   Do you know what that paper was?
24  A   I can't recall what it said on it, but

Page 40

1  there was a Green Tree logo on it. It did have my
2  husband's name on it and a phone number.
3  Q   What did you do in response to that?
4  A   Well, closed the door, and then I called
5  my husband and let him know that somebody was here
6  looking for him.
7  Q   And what did he say?
8  A   Well, he said we'd talk about it when he
9  got home from work. He was at work.
10  Q   And did you talk about it when he got home
11  from work?
12  A   Yes.
13  Q   What did you talk about it?
14  A   I just let him know that a man came to the
15  house, and I showed him the letter, and that was it.
16  Q   Do you know if your husband did anything
17  in response to getting that letter?
18  A   I don't.
19  Q   And you didn't do anything --
20  A   No.
21  Q   -- in response to this visit from Green
22  Tree?
23  A   Uh-uh.
24  Q   You allege that he was intimidating. How

In re
Jeffrey R. Modica, et al., Debtors

KATARZYNA A. MODICA
December 18, 2013

Page 41

1  was he intimidating?
2      A    I guess tone of his voice.
3      Q    What was there about the tone of his voice
4  that you found intimidating?
5      A    I would say harsh.
6      Q    Was he yelling?
7      A    No.
8      Q    And you didn't make any notes or records
9  of that visit by this man?
10     A    Not -- no.
11     Q    Did your children see this man?
12     A    Yes.
13     Q    How did that happen?
14     A    They were in the living room with me, and
15  then when I opened the door, they both -- I was
16  holding my younger one.  He was still a baby, and
17  then my other one was by my side.
18     Q    How old was he?
19     A    Three.
20     Q    The man didn't threaten you in any way,
21  though?
22     A    No.
23     Q    What damages have you personally incurred
24  as a result of Green Tree's phone calls which you

Page 42

1  contend violate the discharge order?
2      A    It's very upsetting and having to explain
3  your situation to my parents and my neighbor.  Just
4  a lot was going on at the time and just very
5  upsetting.  Very upsetting.
6      Q    I thought you said you didn't actually
7  explain anything to your parents?
8      A    Well, they were asking why they were
9  receiving phone calls from somebody that we were
10  dealing with.
11     Q    And what did you tell them?
12     A    Just that we had some -- you know, some
13  stuff to straighten out.  We never revealed what was
14  going on in our personal life.
15     Q    And I thought the neighbor you didn't tell
16  anything?
17     A    No.  We didn't tell her anything.  We
18  didn't tell her anything regarding our financial
19  situation or anything like that.  Just she was
20  curious as to why people were calling her looking
21  for us.
22     Q    You haven't sought any counseling or
23  medical assistance to deal with the emotional
24  ramifications of these calls from Green Tree?

Page 43

1      A    No.
2      Q    Did you experience stress as a result of
3  the fear of losing your house?
4      A    Yes.
5      Q    How significant was that stress to you?
6      A    Significant.
7      Q    You never called Green Tree to talk about
8  ways to avoid losing your house, correct?
9      A    No.
10     Q    Why not?
11     A    I don't know.  There was, like I said, a
12  lot going on besides receiving multiple phone calls
13  on a daily basis.
14     Q    Just so I'm clear, you didn't answer any
15  of those multiple phone calls you received on a
16  daily basis, right?
17     A    No.
18     Q    And you didn't return any calls in
19  response to any of the voicemails left to you
20  multiple times on a daily basis?
21     A    No.
22     Q    Even though those calls were very
23  upsetting to you?
24     A    Right.

Page 44

1      Q    You made no effort to contact Green Tree
2  to tell them to stop calling you, right?
3      A    Right.
4          MR. BLANKENSHIP: I don't have any other
5  questions.
6          MR. BADWAN: Very briefly.
7              CROSS-EXAMINATION
8  BY MR. BADWAN:
9      Q    When you got married to Jeff, he
10  already -- was he already living in the home?
11     A    Yes.
12     Q    And he obtained the loan for the home, was
13  it before you guys got together so --
14     A    We weren't married when he obtained the
15  loan for the house.
16     Q    So he signed for the loan alone --
17     A    Yes.
18     Q    -- for the first and the second mortgage?
19     A    Yes.
20     Q    Now, did you ever give Green Tree your
21  number?
22     A    No.
23     Q    Did you ever tell Green Tree that you
24  filed bankruptcy?

Page 45

1    A    Yes.
2    Q    Did they -- did they ever tell you you
3    need to make a payment?
4    A    Yes.
5    Q    And who told you that?
6    A    Katie Ferguson when she spoke with my
7    husband on that December date.
8    Q    Okay.  But did they ever tell you?
9    A    No.
10   Q    Okay.  When they -- so you never gave them
11   your number.  Did you ever ask them how they got
12   your number?
13   A    No, I never asked.
14   Q    And you testified that you never told them
15   you have an intent to stay in the home when you
16   talked to Katie Ferguson on November 12th?
17   A    Right.
18   Q    You simply just told her -- asked her why
19   she was calling your neighbor?
20   A    Yes.
21   Q    And she responded -- what was her response
22   again?
23   A    That they were just trying to get ahold of
24   us because it was very important.

Page 46

1    Q    Did she tell you she was from Green Tree?
2    A    Yes.
3    Q    Did she tell you the status of the loan,
4    whether it was late or anything like that?
5    A    No.
6    Q    And she called -- you testified earlier
7    she called your neighbor twice, correct?
8    A    Twice.
9    Q    And both times she left voicemails?
10   A    Yes.
11   Q    So the first time -- how did you find out
12   that they called your neighbor the first time?
13   A    My neighbor called me and said that she
14   stated the name, the institution, and the phone
15   number.
16   Q    Okay.  How about the second time?
17   A    Same.
18   Q    How did that make you feel?
19   A    Embarrassed.
20   Q    Did your neighbor ever ask you, "Do you
21   owe people money?"
22   A    Yes.
23   Q    How did you respond?
24   A    I tried to just change the subject.

Page 47

1    Q    Were you embarrassed?
2    A    Yeah, very.
3    Q    Did you feel like your privacy was
4    invaded?
5    A    Yes, definitely.
6    Q    Did your call with Katie Ferguson, was
7    there a sense of urgency in the sense that did she
8    say this is very important.  Your husband needs to
9    call us immediately?
10   A    Yes.
11   Q    Were you receiving mail from Green Tree at
12   the time this was all happening?
13   A    Yes, I was.
14   Q    And could you please describe the contents
15   if you opened -- I don't know if -- they were
16   probably addressed to your husband, but did you ever
17   read any of those mailings?
18   A    Yes.  They were statements.
19   Q    Are you still in possession of those?
20   A    Yes.
21        MR. BADWAN:  Okay.  We'll produce those.
22   BY MR. BADWAN:
23   Q    Now, they were calling you and your
24   husband three to five times a day every single day?

Page 48

1    A    Every single day.
2    Q    Including weekends?
3    A    Yes.
4    Q    Did that affect your marriage in any way?
5    A    Yes, it did.
6    Q    Please elaborate on that.
7    A    Well, very stressful, a lot of sleepless
8    nights.  We fought a lot because we were pretty much
9    at wit's end.  We didn't know what to do.  So both
10   of our hostilities -- we were arguing a lot.
11   Q    Was it a constant reminder almost --
12   A    Pretty much every day.
13   Q    -- of what's going on?
14   A    Yeah.
15   Q    Now, you testified earlier that you didn't
16   call them back and say stop calling.  Is it because
17   you knew why they were calling?
18        MR. BLANKENSHIP: Object to the form of
19   the question.
20   BY MR. BADWAN:
21   Q    Why did you not call them back?
22   A    Because -- you know, well, my husband
23   spoke with them.  It was the same repetitive thing
24   every day, so I didn't want to call back and hear it

In re
Jeffrey R. Modica, et al., Debtors

KATARZYNA A. MODICA
December 18, 2013

Page 49

1  over and over and over again.
2      Q    Now, when they called your mother --
3      A    Uh-huh.
4      Q    -- how did your mother contact you and let
5  you know they called?
6      A    She called me and said, again, this -- she
7  stated the name, where they were calling from, and
8  the phone number they left.
9      Q    When did Green Tree start calling you?
10     A    Right after we stopped paying.
11     Q    And you only had -- was it one
12  conversation you testified to with Katie Ferguson,
13  and that was on November 12th after they called your
14  neighbor twice?
15     A    Yeah, the two-minute phone call and the
16  nine-minute phone call.
17     Q    Did you ever at one point realize they
18  shouldn't be calling you?
19     A    Yes, I did.
20     Q    And when was that?
21     A    When they were -- we -- my husband advised
22  them that we had filed for bankruptcy so . . .
23     Q    Did you have to tell your parents about
24  your bankruptcy filing?

Page 50

1      A    I did.
2      Q    And was it the same day that your mom
3  called you and advised you that they called?
4      A    It was the second time.
5      Q    How did that make you feel?
6      A    Embarrassed.
7      Q    Invasion of privacy?
8      A    Yes.
9      Q    Did you ever give Green Tree your mother's
10  number?
11     A    No.
12     Q    Did your husband ever give them her
13  number?
14     A    No.
15     Q    Did your husband ever give Green Tree, to
16  the best of your knowledge, your neighbor's number?
17     A    No.
18     Q    Did your husband ever give them his
19  mother's number?
20     A    No.
21     Q    All right.  You testified that a man,
22  about six-one, Caucasian male, about 220 pounds came
23  to your house.  What kind of vehicle did he approach
24  in?

Page 51

1      A    It was a tan pickup.
2      Q    And where did he park it?
3      A    Right in my driveway.
4      Q    And did he ring the doorbell?
5      A    Yeah, he rang my doorbell.  He rang my
6  doorbell.
7      Q    How many times?
8      A    Twice.
9      Q    And you stated that you were there with
10  your children --
11     A    Yes.
12     Q    -- at that point?
13     A    Uh-huh.
14     Q    The two younger ones or was it all three?
15     A    It was just the two younger ones.
16     Q    Okay.  And when you went to the door, who
17  went with you to the door?
18     A    My kids.
19     Q    Both of them?
20     A    Yeah.
21     Q    Were you carrying one?
22     A    Yes.
23     Q    Did it startle your kids?
24     A    A little bit, yeah.

Page 52

1      Q    Did they ask who this man was?
2      A    My older one did.
3      Q    How old was he at the time approximately?
4      A    Three.
5      Q    And how did you respond?
6      A    I just said, "Oh, it's somebody for
7  Daddy," because I didn't want to elaborate to my
8  three-year old son who was at our door.
9      Q    Did he say he was from Green Tree?  I know
10  you testified that he gave you a document that had a
11  Green Tree logo.  Did he say --
12     A    He didn't state his name or say he was
13  from Green Tree, but when he handed me the paper, I
14  saw the Green Tree logo on the top of it so . . .
15     Q    Did you see him inspecting the house in
16  any way to see if you guys were still living there?
17     A    Well, when I had my door opened, he was in
18  view of the inside of my house.
19     Q    Okay.  How long would you say your
20  interaction with this man lasted for?
21     A    Three minutes.
22     Q    What was going through your head at this
23  point?
24     A    Just wondering why there was somebody at

BISTANY REPORTING SERVICE
(312) 551-9192

Page 53

1 my door to drop off a paper. Kind of shocked that
2 somebody would come to my house to drop off a paper.
3    Q   Did it make you feel like you were losing
4 your house?
5        MR. BLANKENSHIP: Object to the form of
6 the question.
7 BY MR. BADWAN:
8    Q   Was the foreclosure filed at this point;
9 can you recall?
10    A   No. I don't recall. I don't think so.
11    Q   Okay. That's fine. If you don't know --
12    A   I'm not sure.
13    Q   That's fine. You're not sure?
14    A   No, I'm not sure.
15    Q   Okay. By this man -- what message did you
16 take in by this man coming? I mean, what was going
17 through your head? Tell us.
18    A   I guess aggressive because to send
19 somebody to my house and then to drop off a paper
20 and tell me you better have your husband call when
21 he gets home is kind of -- to me it felt very
22 aggressive.
23    Q   Did it make you feel that you need to move
24 soon?

Page 54

1        MR. BLANKENSHIP: Object to the form of
2 the question.
3 BY MR. BADWAN:
4    Q   Answer the question.
5    A   Yes.
6    Q   Did you and your husband start -- did you
7 guys start talking about moving out after this man
8 came?
9    A   Yeah.
10    Q   To the best of your knowledge, did Jeff
11 have to tell his mother why they were receiving the
12 calls?
13    A   Yes.
14    Q   Why you guys were -- why his mother was
15 receiving calls?
16    A   Yes.
17    Q   Did he, to the best of your knowledge,
18 have to tell his mom about the bankruptcy?
19        MR. BLANKENSHIP: Well, objection,
20 speculation.
21 BY MR. BADWAN:
22    Q   Did he ever tell you that he had told his
23 mom he had filed bankruptcy?
24    A   Yes.

Page 55

1    Q   Did he tell you it was a direct cause of
2 the calls?
3    A   Yes.
4    Q   Outside the call on November 12th, you
5 never had a call with Katie Ferguson, an actual
6 conversation, correct?
7    A   No.
8    Q   But she would leave voicemails?
9    A   Yes.
10    Q   And would it be Katie Ferguson every
11 single time?
12    A   Yes.
13    Q   Now, let's talk about the long
14 conversation that your husband had with Katie
15 Ferguson on approximately December 20, 2011. Were
16 you home that day?
17    A   Yes.
18    Q   And can you approximate what time that
19 was?
20    A   Late afternoon.
21    Q   Okay. What were you doing when this --
22 were you -- did you see him have this conversation
23 or did he just tell you about it?
24    A   No, I saw him have the conversation.

Page 56

1    Q   Where were you guys located in your house?
2    A   He was in the bedroom, and I was in the
3 laundry room doing laundry.
4    Q   Could you hear the conversation?
5    A   Yes.
6    Q   Tell us about his tone or his demeanor
7 while he was having this conversation.
8    A   I guess upset for sure and irritated.
9    Q   How long did this conversation last for,
10 if you can approximate? I know it was two years
11 ago.
12    A   About an hour.
13    Q   What happened when he got off the phone?
14    A   He was very upset.
15    Q   What did he tell you?
16    A   Just that he couldn't believe that, you
17 know, this was happening, and that he was on the
18 phone with them for an hour just explaining
19 everything and them asking for a payment, any kind
20 of payment, when he tried -- you know, he explained
21 to them.
22        And then when the supervisor bluntly told
23 him if you filed bankruptcy, how come you don't have
24 money to pay back the debt?

In re
Jeffrey R. Modica, et al., Debtors

KATARZYNA A. MODICA
December 18, 2013

Page 57

1    Q    Did he tell you or did you -- I'll
2  start -- did you hear any of the conversation?  Was
3  the word "loan modification" ever --
4        MR. BLANKENSHIP: Object to the form.
5  BY MR. BADWAN:
6    Q    Did you hear your husband say the word
7  "loan modification"?
8    A    No.
9    Q    After he got off the phone, did he say
10 that -- did you guys discuss loan modification and
11 start making payments to Green Tree?
12   A    No.
13   Q    Did you hear your husband say, "We filed
14 bankruptcy"?
15   A    Yes.
16   Q    You heard it personally; it's not like he
17 told you?
18   A    Yes.
19   Q    Did they -- okay.  Just describe one last
20 time the overall effect of these phone calls, the
21 large intimidating man.  If you had to summarize how
22 it made you feel and how it affected you and your
23 life, in a nutshell, how would you describe it using
24 adjectives?

Page 58

1    A    Scared, intimidated, stressed,
2  overwhelmed.
3    Q    And you testified that you received a loan
4  modification on the first mortgage, correct?
5    A    Yes.
6    Q    And were they calling you?
7    A    No.
8    Q    And were you in default?
9    A    Yes.
10   Q    So you weren't making payments on either
11 mortgage, but the first mortgage wasn't calling you
12 but Green Tree was?
13   A    Right.
14   Q    Did you ever speak to a representative
15 with Bayview, which I believe is the servicer that
16 gave the loan modification?
17   A    My husband did.
18   Q    But they never called you?
19   A    No.
20   Q    They never called your mother?
21   A    No.
22   Q    They never called your neighbor?
23   A    Uh-uh.
24   Q    They never called Jeff's mother?

Page 59

1    A    No.
2        MR. BADWAN: I have no further questions.
3        REDIRECT EXAMINATION
4  BY MR. BLANKENSHIP:
5    Q    What was scary about a voicemail that
6  asked you to call them?
7    A    Because it was every single day and just
8  the sense of urgency.  It was scary to me.  We had a
9  lot of stuff going on at the time, not only worrying
10 about my kids, worrying about everyday life.  And
11 then I had, on top of all that, to deal with three
12 phone calls a day and a voicemail left every single,
13 you know, time.
14   Q    But you weren't scared enough to return
15 any of the voicemails?
16   A    No.
17   Q    And you weren't scared enough to consult
18 an attorney, consult your bankruptcy attorney,
19 correct?
20   A    No.
21   Q    And you weren't scared enough to tell your
22 husband to call Green Tree to get them to stop
23 making calls, right?
24   A    Not that I recall, no.

Page 60

1    Q    Did the stress of possibly losing your
2  house affect your marriage?
3    A    Yes.
4    Q    Did the stress of losing your house affect
5  your marriage more than the voicemails left by Green
6  Tree?
7    A    No.
8    Q    You equate -- was the stress caused by the
9  calls from Green Tree greater than the stress of
10 possibly losing your house?
11   A    Yes.
12   Q    But still you didn't call Green Tree --
13   A    No.
14   Q    -- to tell them to stop?
15       You never personally told Green Tree that
16 you had filed for bankruptcy, right?
17   A    Personally, no.
18   Q    And Green Tree never personally asked you
19 to make a payment, right?
20   A    No.
21   Q    When your husband was on the phone call
22 with Green Tree on December 20th for approximately
23 an hour, what did you understand them to be talking
24 about for that long a period of time?

Page 61

1    A   Well, I understood that they were asking
2 for a payment from my --
3    Q   Okay.  That takes a couple seconds.  That
4 doesn't take an hour.  What was going on during that
5 hour?
6    A   I don't know the content of the call.
7        MR. BADWAN: Calls for speculation.  I
8 object.
9    A   I don't know.
10 BY MR. BLANKENSHIP:
11   Q   What did you hear?  What did you hear your
12 husband say during that hour on the phone call?
13   A   He just was explaining that -- about that
14 we didn't -- just having to explain to somebody
15 about, you know, if you filed for bankruptcy, how do
16 you not have the money?  That's embarrassing.  And
17 my husband wanted to clarify that that was out of
18 line on their part to ask something like that.
19   Q   Okay.  Again, I don't see how that can
20 take an hour.  What else did you hear him say during
21 that hour?
22       MR. BADWAN: Objection.  She was not a
23 party to the conversation.  All she could hear is
24 what her husband was saying.

Page 62

1 BY MR. BLANKENSHIP:
2    Q   Yeah.  That's what I want to know.  What
3 did he say for an hour besides, "I filed for
4 bankruptcy"?  What else did he say during that hour
5 you heard the call?
6    A   I don't -- I wasn't on the phone with him
7 when he was talking to them.
8    Q   No.  But you were present.  You said in
9 response to your attorneys --
10   A   I was present but --
11   Q   Did you actually hear anything your
12 husband said on that phone call?
13   A   I did.  I did hear.
14   Q   What?  What?
15   A   He -- about the payment that they were
16 asking for.
17   Q   You didn't hear Green Tree say anything,
18 right?
19   A   No.
20   Q   So what did your husband -- you hear your
21 husband say during that one-hour phone call?
22   A   Just about the payment; that we weren't --
23 we didn't -- we weren't paying because we didn't
24 have it, and then he was talking to the supervisor,

Page 63

1 whatever they were talking about.  And I heard him
2 explain -- asking him why he would ask if we filed
3 for the bankruptcy, why did we not have the money.
4    Q   And you don't know what the supervisor
5 was --
6    A   No.
7    Q   -- actually talking to your husband about?
8    A   Uh-huh.
9    Q   Were you embarrassed to file bankruptcy?
10   A   No.
11   Q   And you understand your bankruptcy is a
12 matter of public record, right?
13   A   Right.
14   Q   But you were embarrassed, then, to tell
15 your parents about the bankruptcy?
16   A   Yes, absolutely.
17   Q   But the bankruptcy itself didn't embarrass
18 you?
19   A   Not really.  I mean, explaining to your
20 parents why you had to do something that they have
21 no concern with is embarrassing in itself to have to
22 explain to somebody what your financial situation
23 is.
24   Q   And if you had simply returned Green

Page 64

1 Tree's phone calls, you never would have had to
2 explain it to your parents, correct?
3        MR. BADWAN: It calls for speculation,
4 objection.
5 BY MR. BLANKENSHIP:
6    Q   You can answer.  You can answer the
7 question.
8    A   Oh, I'm sorry.  What was the question
9 again?
10   Q   If you had simply returned Green Tree's
11 phone calls beginning in September 2011, you never
12 would have had to explain to your parents anything,
13 right?
14       MR. BADWAN: I reinstate the objection,
15 but you can answer.
16   A   Possibly not.
17       MR. BLANKENSHIP: Okay.  That's all.
18 Thanks.
19       MR. BADWAN: We are done.
20       THE REPORTER: Signature?
21       MR. BADWAN: We can waive, yeah.
22            (WITNESS EXCUSED.)
23
24

Page 65

```
1  STATE OF ILLINOIS        )
2  COUNTY OF COOK           ) SS.
                            )
3
4        I, DENIELLE P. MATHYS, Certified Shorthand
5  Reporter No. 084-003933, and Notary Public within
6  and for the County of Kane and State of Illinois, do
7  hereby certify that on December 18, 2013, at
8  11:07 a.m., at 150 North Michigan Avenue,
9  Suite 2130, in the City of Chicago, Illinois, the
10 deponent, KATARZYNA A. MODICA, personally appeared
11 before me.
12       I further certify that KATARZYNA A. MODICA
13 was by me duly sworn to testify the truth and that
14 the foregoing is a true record of the testimony
15 given by KATARZYNA A. MODICA.
16       I further certify that the deposition
17 terminated at 12:04 p.m.
18       I further certify that there were present
19 at the taking of the said deposition the persons and
20 parties as indicated on the appearance page made a
21 part of this deposition transcript.
22       I further certify that the signature of
23 the witness to the foregoing deposition was waived
24 by agreement of counsel; and that I am not counsel
```

Page 66

```
1  for nor in any way related to any of the parties to
2  this suit, nor am I in any way interested in the
3  outcome thereof.
4        IN TESTIMONY WHEREOF, I have hereunto set
5  my hand and affixed my notarial seal on this 30th
6  day of December, 2013.
7
8
9
10
11
12
13              _____
                DENIELLE P. MATHYS, CSR
                Notary Public
14              CSR License No. 084-003933
15
16
17
18
19
20
21
22
23
24
```

In re
Jeffrey R. Modica, et al., Debtors

KATARZYNA A. MODICA
December 18, 2013

## $

**$375 (1)**
11:19
**$51,000 (1)**
9:1

## A

**absolutely (1)**
63:16
**accept (1)**
27:4
**accurate (1)**
16:12
**actual (2)**
17:15;55:5
**actually (7)**
15:9;33:18;35:11;
36:16;42:6;62:11;63:7
**Addison (3)**
5:8;8:7;10:16
**addressed (1)**
47:16
**adjectives (1)**
57:24
**advised (6)**
14:19;20:23;23:22;
24:1;49:21;50:3
**affect (3)**
48:4;60:2,4
**affected (2)**
10:17;57:22
**afternoon (1)**
55:20
**again (16)**
23:22,23;24:1,2,2,
22;25:2;26:19;32:12;
34:3;36:20;45:22;49:1,
6;61:19;64:9
**against (1)**
4:16
**aggressive (2)**
53:18,22
**ago (2)**
9:13;56:11
**agreement (1)**
4:10
**ahead (1)**
10:23
**ahold (9)**
21:8,19,23;22:13;
25:16;34:5,20;36:22;
45:23
**allege (4)**
18:1;31:19;37:18;
40:24
**allowed (1)**
21:22
**almost (1)**
48:11
**alone (1)**

44:16
**always (2)**
31:10,13
**America (4)**
9:23;12:2,21;13:10
**amount (1)**
8:24
**applicable (1)**
4:11
**approach (1)**
50:23
**approximate (2)**
55:18;56:10
**approximately (8)**
9:15;11:19;12:11;
17:18;19:2;52:3;55:15;
60:22
**April (2)**
27:24;28:8
**arguing (1)**
48:10
**around (1)**
8:7
**arrange (1)**
14:1
**assistance (1)**
42:23
**assisting (1)**
6:9
**attempt (1)**
14:1
**attorney (2)**
59:18,18
**attorneys (1)**
62:9
**Avenue (1)**
5:8
**avoid (2)**
20:15;43:8
**aware (2)**
37:8,13
**away (1)**
38:21

## B

**baby (1)**
41:16
**back (14)**
17:24;19:10,13,21;
20:1;31:3;32:21;33:2;
36:3,23;48:16,21,24;
56:24
**bad (1)**
39:5
**BADWAN (20)**
10:19,24;11:3;26:24;
44:6,8;47:21,22;48:20;
53:7;54:3,21;57:5;
59:2;61:7,22;64:3,14,
19,21
**Bank (4)**
9:23;12:1,21;13:10

**Bankruptcy (29)**
4:11;9:5;10:6,9,13,
17;13:18;14:20,21;
22:5;29:18;35:1,4;
44:24;49:22,24;54:18,
23;56:23;57:14;59:18;
60:16;61:15;62:4;63:3,
9,11,15,17
**basis (4)**
28:12;43:13,16,20
**Bayview (1)**
58:15
**becomes (1)**
31:7
**bedroom (1)**
56:2
**began (1)**
14:17
**beginning (1)**
64:11
**besides (3)**
20:5;43:12;62:3
**best (7)**
19:7;21:3,9;25:2;
50:16;54:10,17
**better (1)**
53:20
**bills (2)**
15:6,8
**Birmingham (7)**
36:7,10,14,16;37:5,
11,15
**birthday (1)**
5:10
**bit (1)**
51:24
**BLANKENSHIP (22)**
4:5,8,12,14;7:5;
10:21,23;11:2,4;16:3;
27:1;44:4;48:18;53:5;
54:1,19;57:4;59:4;
61:10;62:1;64:5,17
**bluntly (1)**
56:22
**both (8)**
10:7;27:7,10;31:20;
41:15;46:9;48:9;51:19
**Bounce (4)**
26:24;27:2,3;31:10
**break (1)**
5:4
**briefly (1)**
44:6
**brown (1)**
39:1

## C

**call (69)**
14:18;19:10,13,21;
20:2,12,19,22;21:4,4,
20,22,22;22:4,5,10,22;
23:1,4,6,8,10,12,18,20,

21,24;25:4,12,14,15;
26:13,21;27:2,4,16,20;
29:9;30:20;31:1,3,15;
32:21;33:9,14;34:6;
36:9,13,23;39:17;47:6,
9;48:16,21,24;49:15,
16;53:20;55:4,5;59:6,
22;60:12,21;61:6,12;
62:5,12,21
**called (39)**
4:2;18:3,5;20:1,24;
21:7;23:23;24:2,4,16,
18,21,23;27:23;31:20;
32:2,4,20,24;33:2,6;
35:11;36:6;40:4;43:7;
46:6,7,12,13;49:2,5,6,
13;50:3,3;58:18,20,22,
24
**calling (28)**
14:17;19:8,19,22;
20:9;21:2,10;22:7,12;
25:6,19;30:23;31:4;
34:4,17,20;36:21;
42:20;44:2;45:19;
47:23;48:16,17;49:7,9,
18;58:6,11
**calls (47)**
14:22;15:3,13;16:15,
19,24;17:9,11,13,15;
18:11,20;19:3,20;
25:23;26:5;30:14,23;
31:8,9;32:13,16;33:12;
34:13;35:12,13;37:11,
13;38:21;41:24;42:9,
24;43:12,15,18,22;
54:12,15;55:2;57:20;
59:12,23;60:9;61:7;
64:1,3,11
**came (3)**
40:14;50:22;54:8
**can (15)**
4:20;10:24;11:1;
19:7;21:3;25:2;38:23;
53:9;55:18;56:10;
61:19;64:6,6,15,21
**carrying (1)**
51:21
**Caucasian (1)**
50:22
**cause (2)**
13:2;55:1
**caused (1)**
60:8
**cell (5)**
15:5;17:3,5;18:22;
31:13
**certain (1)**
31:6
**change (1)**
46:24
**children (2)**
41:11;51:10
**chose (1)**

31:17
**clarify (2)**
21:1;61:17
**clear (2)**
31:12;43:14
**closed (1)**
40:4
**collect (1)**
30:21
**college (2)**
5:20,21
**coming (2)**
31:15;53:16
**concern (1)**
63:21
**concluded (1)**
30:1
**conclusion (1)**
10:20
**constant (1)**
48:11
**consult (2)**
59:17,18
**contact (5)**
21:11;25:17,19;44:1;
49:4
**contacted (1)**
18:2
**contend (2)**
16:16;42:1
**content (2)**
19:6;61:6
**contents (1)**
7:23;22:21;47:14
**continue (1)**
26:18
**continued (5)**
11:13,18;12:14;
14:18;28:8
**conversation (23)**
7:24;15:14;17:16;
18:23;21:14;22:2;
26:10;27:22;28:23;
29:1,3,6,16;49:12;55:6,
14,22,24;56:4,7,9;57:2;
61:23
**conversations (9)**
15:9,20;18:8,14;
27:7;30:24;32:12;34:2,
7
**counsel (1)**
7:21
**counseling (1)**
42:22
**Countrywide (9)**
8:15,22;9:9;11:5,9,
14,15,22;12:8
**Countrywide's (1)**
10:15
**couple (2)**
17:10,12;19:5;61:3
**court (1)**
4:24;10:13

**CROSS-EXAMINATION (1)**
44:7
**curious (1)**
42:20
**current (3)**
10:7;34:22;35:7

**D**

**Daddy (1)**
52:7
**daily (4)**
28:12;43:13,16,20
**damages (1)**
41:23
**date (1)**
45:7
**dates (1)**
15:8
**day (23)**
16:19,24;17:13;18:4;
19:2,18;28:14;30:20;
31:2,4,8;36:11;37:24;
38:6;47:24,24;48:1,12,
24;50:2;55:16;59:7,12
**days (1)**
6:6
**deal (2)**
42:23;59:11
**dealing (1)**
42:10
**debt (2)**
14:17;56:24
**debtors (7)**
14:16,19,22;16:17;
18:3;31:21;37:19
**Debtors' (2)**
18:2;31:20
**December (5)**
28:24;29:9;45:7;
55:15;60:22
**decided (1)**
19:19
**default (1)**
58:8
**definitely (1)**
47:5
**demeanor (2)**
29:22;56:6
**deposed (1)**
4:17
**deposition (2)**
4:9;6:20
**Describe (5)**
30:1;38:23;47:14;
57:19,23
**DIRECT (2)**
4:4;55:1
**discharge (7)**
10:12;11:17;14:21;
16:16;18:9,21;42:1
**discuss (2)**
14:4;57:10

**discussion (1)**
34:12
**discussions (2)**
30:12;37:10
**distinguish (1)**
16:21
**document (1)**
52:10
**documentation (1)**
15:2
**documents (4)**
7:13;35:9,11,14
**done (1)**
64:19
**Donna (2)**
36:7,10
**door (9)**
38:16,17;40:4;41:15;
51:16,17;52:8,17;53:1
**doorbell (4)**
38:15;51:4,5,6
**down (6)**
4:24;16:17;32:4,20;
35:10,12
**Drastic (1)**
13:1
**driveway (2)**
38:14;51:3
**drop (3)**
53:1,2,19
**duly (1)**
4:2
**during (13)**
21:3;22:4,5;25:4,23;
26:5;29:5;34:2;61:4,
12,20;62:4,21

**E**

**earlier (3)**
28:5;46:6;48:15
**early (2)**
38:2,3
**education (1)**
5:19
**effect (2)**
26:3;57:20
**effort (1)**
44:1
**Eight (1)**
5:16
**either (5)**
25:23;26:5;34:10;
36:1;58:10
**elaborate (2)**
48:6;52:7
**else (14)**
7:19;19:11;20:5,8;
21:13;23:3,6;25:9;
26:9;29:15,20;37:3;
61:20;62:4
**embarrass (1)**
63:17

**Embarrassed (5)**
46:19;47:1;50:6;
63:9,14
**embarrassing (2)**
61:16;63:21
**emotional (1)**
42:23
**employed (2)**
6:3,5
**end (3)**
21:20;22:10;48:9
**ended (1)**
22:18
**enough (4)**
31:3;59:14,17,21
**equate (1)**
60:8
**even (3)**
14:19;25:16;43:22
**event (1)**
11:7
**everyday (1)**
59:10
**exactly (2)**
9:13;33:13
**EXAMINATION (2)**
4:4;59:3
**examined (1)**
4:3
**EXCUSED (1)**
64:22
**Exhibit (10)**
7:3,7;14:8,12;16:1,5,
8,11;17:24;37:17
**exist (3)**
35:14,16;36:1
**experience (1)**
43:2
**explain (9)**
21:9;29:8;42:2,7;
61:14;63:2,22;64:2,12
**explained (3)**
21:17;29:7;56:20
**explaining (3)**
56:18;61:13;63:19
**explanation (1)**
22:12

**F**

**fact (2)**
11:17;30:6
**fall (1)**
9:15
**fear (1)**
43:3
**Federal (1)**
4:11
**feel (7)**
5:12;46:18;47:3;
50:5;53:3,23;57:22
**felt (1)**
53:21

**Ferguson (26)**
16:20;18:3,5,17;
20:3,6,22;21:5,16;
22:14,22;23:1;24:16,
21;25:3;28:10,23;
29:11;31:20;45:6,16;
47:6;49:12;55:5,10,15
**Ferguson' (1)**
14:24
**few (1)**
10:4
**file (1)**
63:9
**filed (17)**
7:8;9:5;10:6,9;
13:18;14:8;29:18;
44:24;49:22;53:8;
54:23;56:23;57:13;
60:16;61:15;62:3;63:2
**filing (1)**
49:24
**finalized (2)**
10:4;16:9
**financial (1)**
42:18;63:22
**find (1)**
46:11
**fine (2)**
53:11,13
**finish (2)**
5:1;6:1
**first (22)**
4:2;10:1;12:4,21;
15:1;20:2,11,19;21:4,
14;22:21;23:10,24;
24:16,18;36:9;38:4;
44:18;46:11,12;58:4,
11
**five (5)**
16:24;17:13,20,21;
47:24
**follows (1)**
4:3
**force (1)**
11:10
**foreclose (4)**
11:15,22;13:10,23
**foreclosure (6)**
9:20,21;11:6,10;
20:15;53:8
**forgot (1)**
26:22
**form (4)**
48:18;53:5;54:1;
57:4
**fought (1)**
48:8
**found (1)**
41:4
**full (1)**
13:3
**further (1)**
59:2

**G**

**gave (4)**
38:19;45:10;52:10;
58:16
**gets (3)**
38:20;39:16;53:21
**goatee (1)**
38:24
**greater (1)**
60:9
**Green (93)**
4:14,16;11:21;12:8,
15,18;13:9,19,22,23;
14:2,5,17,18,23;15:3,9,
13,16,20;16:6,9;17:15,
17;18:2,9,14,20;23:18;
25:18,21,24;26:6,16,
19,22;27:7,11,17,23;
29:9;30:13;32:2,13,20,
23;33:2,6,9,14,19;34:1,
2,4,6,8,13;36:6,9,17,
21;37:11,14,18;40:1,
21;41:24;42:24;43:7;
44:1,20,23;46:1;47:11;
49:9;50:9,15;52:9,11,
13,14;57:11;58:12;
59:22;60:5,9,12,15,18,
22;62:17;63:24;64:10
**Group (1)**
9:12
**guess (3)**
41:2;53:18;56:8
**guys (6)**
44:13;52:16;54:7,14;
56:1;57:10

**H**

**hair (1)**
39:1
**half (2)**
6:13;38:4
**halfway (1)**
16:17
**Halina (4)**
31:23;33:7,17;34:1
**hand (1)**
39:21
**handed (5)**
38:18;39:14;52:13
**handful (1)**
17:18
**hang (4)**
22:14,15,16;30:19
**happen (2)**
37:22;41:13
**happened (5)**
16:22,22;20:12;
38:11;56:13
**happening (2)**
47:12;56:17

**harsh (1)**
41:5
**head (1)**
30:19;52:22;53:17
**hear (13)**
48:24;56:4;57:2,6,
13;61:11,11,20,23;
62:11,13,17,20
**heard (3)**
57:16;62:5;63:1
**heavier (1)**
38:24
**heavy (1)**
39:4
**highest (1)**
5:19
**hold (1)**
6:11
**holding (1)**
41:16
**home (20)**
6:18;10:10;11:11,23;
13:3,20;24:10;31:14,
14;38:17,20;39:10,16;
40:9,10;44:10,12;
45:15;53:21;55:16
**hostilely (2)**
22:10,11
**hostilities (1)**
48:10
**hour (11)**
8:5;56:12,18;60:23;
61:4,5,12,20,21;62:3,4
**house (21)**
9:20;13:11,15;17:22;
20:15,17;26:1;40:15;
43:3,8;44:15;50:23;
52:15,18;53:2,4,19;
56:1;60:2,4,10
**hundred (1)**
14:22
**hung (1)**
21:21
**husband (43)**
5:7;7:18;8:12;16:23;
18:12;19:17,23;21:24;
26:23;28:19,24;29:8,
12,14,16;30:24;34:10;
40:5,16;45:7;47:8,16,
24;48:22;49:21;50:12,
15,18;53:20;54:6;
55:14;57:6,13;58:17;
59:22;60:21;61:12,17,
24;62:12,20,21;63:7
**husband's (3)**
29:22;31:24;40:2

## I

**identification (2)**
7:4;16:2
**identified (1)**
36:21

**ignore (1)**
31:17
**Illinois (1)**
5:8
**Immediately (2)**
14:16;47:9
**important (8)**
19:9;21:19;25:13;
34:5;38:21;39:17;
45:24;47:8
**Including (1)**
48:2
**income (1)**
13:1
**incurred (1)**
41:23
**indicated (1)**
35:10
**Indicating (1)**
22:19
**information (2)**
16:15;25:7
**initial (2)**
8:14;18:11
**initiate (1)**
22:24
**initiated (1)**
20:2
**inquiring (1)**
31:21
**inside (1)**
52:18
**inspecting (1)**
52:15
**institution (2)**
32:5;46:14
**insult (1)**
30:4
**intent (2)**
10:10;45:15
**interaction (1)**
52:20
**interrogatories (1)**
16:6
**intimidated (1)**
58:1
**intimidating (5)**
37:19;40:24;41:1,4;
57:21
**into (3)**
8:6;10:24;38:14
**invaded (1)**
47:4
**Invasion (1)**
50:7
**irritated (1)**
56:8

## J

**Jeff (17)**
5:13;25:12,14,19,20;
32:8,9,17;33:2;36:22,

23;37:14;38:20;39:10,
16;44:9;54:10
**Jeffrey (1)**
38:17
**Jeff's (4)**
35:3,6;37:15;58:24
**job (1)**
6:8
**June (1)**
9:6

## K

**KATARZYNA (3)**
4:1,7,9
**Katie (12)**
14:24;16:19;18:3,5;
29:11;45:6,16;47:6;
49:12;55:5,10,14
**kept (1)**
38:14
**kids (6)**
6:18;13:4;38:13;
51:18,23;59:10
**kind (5)**
10:3;50:23;53:1,21;
56:19
**knew (4)**
19:17;31:13,15;
48:17
**knowing (1)**
25:16
**knowledge (3)**
50:16;54:10,17
**Kuzianik (1)**
31:23

## L

**land (2)**
17:21;24:9
**large (2)**
37:19;57:21
**last (11)**
6:8;10:4;12:17,20;
20:20;23:12;27:16,20,
23;56:9;57:19
**lasted (1)**
52:20
**late (7)**
16:18,18,24;17:1;
38:2;46:4;55:20
**laundry (2)**
56:3,3
**Law (1)**
9:12
**least (2)**
33:1,11
**leave (2)**
13:15;55:8
**leaving (1)**
27:11
**left (17)**

23;37:14;38:20;39:10,
16;44:9;54:10
**legal (1)**
10:20
**letter (2)**
40:15,17
**level (1)**
5:19
**lien (1)**
10:16
**life (3)**
42:14;57:23;59:10
**line (6)**
17:22;20:5;23:3;
24:9;29:14;61:18
**little (2)**
9:14;51:24
**live (1)**
5:7
**living (4)**
38:12;41:14;44:10;
52:16
**loan (18)**
8:17;9:3;10:1;11:19;
12:8;14:4;22:2;26:7;
29:19;44:12,15,16;
46:3;57:3,7,10;58:3,16
**loans (1)**
10:7
**located (1)**
56:1
**logo (3)**
40:1;52:11,14
**long (11)**
5:15,23;8:4;20:19;
23:10,12;30:10;52:19;
55:13;56:9;60:24
**look (5)**
6:23;7:13;14:15;
16:4,14;28:22
**looked (4)**
6:21;7:10;14:10,11
**looking (3)**
30:8;40:6;42:20
**losing (6)**
43:3,8;53:3;60:1,4,
10
**lot (9)**
8:12;30:3,18;42:4;
43:12;48:7,8,10;59:9

## M

**machine (6)**
21:1;24:3,10,15;
25:1;36:19
**mail (1)**
47:11
**mailings (1)**
47:17

**makes (1)**
5:12
**making (6)**
12:23;13:5,8;57:11;
58:10;59:23
**male (1)**
50:22
**man (14)**
37:19;38:16,23;
40:14;41:9,11,20;
50:21;52:1,20;53:15,
16;54:7;57:21
**manifest (1)**
30:6
**many (5)**
17:15;19:1;32:23;
33:9;51:7
**March (6)**
6:15;12:11;37:23;
38:2,3,4
**Margaret (6)**
32:1,3,13,24;33:3;
35:10
**marked (4)**
7:4,6;16:2,4
**marriage (3)**
48:4;60:2,5
**married (7)**
5:13,15;8:18,19,20;
44:9,14
**Marshall (1)**
4:13
**matter (1)**
63:12
**May (3)**
8:21;16:18;17:1
**maybe (1)**
9:13
**mean (2)**
53:16;63:19
**Medical (2)**
6:9;42:23
**message (5)**
20:24;24:3,11,24;
53:15
**messages (1)**
33:3
**Mid-morning (1)**
38:7
**might (1)**
33:16
**minutes (5)**
20:21;23:11,13;
24:19;52:21
**mistake (2)**
28:2,4
**MODICA (9)**
4:1,7,9,13;5:13;7:3;
16:1,5;25:12
**modification (7)**
10:1;14:4;57:3,7,10;
58:4,16
**mom (7)**

33:8,10;37:15,15;
50:2;54:18,23
**money (4)**
46:21;56:24;61:16;
63:3
**month (3)**
9:8;11:19;12:5
**monthly (4)**
11:14,18;12:15,17
**months (1)**
10:4
**more (1)**
60:5
**morning (3)**
20:13;23:9;30:11
**mortgage (16)**
8:14,22;9:9;10:1,16;
11:6,7;12:4,21;34:19,
22;35:7;44:18;58:4,11,
11
**mortgages (2)**
12:24;13:10
**mother (9)**
34:7,13;35:18;49:2,
4;54:11,14;58:20,24
**mother's (2)**
50:9,19
**motion (5)**
4:16;7:1,7;14:7;
17:24
**move (1)**
53:23
**moved (1)**
8:6
**moving (1)**
54:7
**much (5)**
13:5;25:5;30:4;48:8,
12
**multiple (4)**
28:14;43:12,15,20

**N**

**name (11)**
4:6,13;14:23;19:8;
32:5;34:3;35:20;40:2;
46:14;49:7;52:12
**need (4)**
5:4;21:22;45:3;
53:23
**needs (1)**
47:8
**neighbor (28)**
18:2;20:23;21:2,7,
11;22:8;23:23;24:6,6,
8,12,21,23;25:6,11,15,
19;27:14;36:7;42:3,15;
45:19;46:7,12,13,20;
49:14;58:22
**neighborhood (2)**
22:13;27:12
**neighbor's (3)**

24:3,15;50:16
**next (1)**
30:11
**night (1)**
20:23
**nights (1)**
48:8
**Nine (1)**
23:13
**nine-minute (1)**
49:16
**Northwest (1)**
6:9
**notes (9)**
15:2,19;22:20;26:12;
35:21,24;37:5,8;41:8
**notice (1)**
4:10
**November (30)**
18:1,6,10,14,18,22;
20:1,3,12,14,20;21:4;
23:1,23;25:4,24;26:6,
10;27:8,20;28:7;33:15;
36:3,4,12,13,14;45:16;
49:13;55:4
**number (15)**
17:5;19:24;32:6;
35:20;37:1;40:2;44:21;
45:11,12;46:15;49:8;
50:10,13,16,19
**nutshell (1)**
57:23

**O**

**Object (5)**
48:18;53:5;54:1;
57:4;61:8
**Objection (5)**
10:19;54:19;61:22;
64:4,14
**obtained (5)**
8:14,21;9:9;44:12,14
**occasion (1)**
26:15
**occasions (1)**
19:24
**occurred (1)**
27:7
**o'clock (1)**
38:8
**o'clock-ish (1)**
38:9
**October (3)**
6:15;16:18;17:1
**off (6)**
29:23;53:1,2,19;
56:13;57:9
**old (4)**
5:12;41:18;52:3,8
**older (1)**
52:2
**one (14)**

14:22;16:24;24:12;
25:15;27:6;30:18;34:5;
41:16,17;49:11,17;
51:21;52:2;57:19
**one-hour (1)**
62:21
**ones (2)**
51:14,15
**only (5)**
27:6;32:7,16;49:11;
59:9
**opened (4)**
38:16;41:15;47:15;
52:17
**options (1)**
9:19
**order (3)**
16:16;21:22;42:1
**originally (1)**
21:6
**out (5)**
13:11;42:13;46:11;
54:7;61:17
**outgoing (1)**
23:17
**Outside (1)**
55:4
**over (9)**
6:21,23;7:10;9:14;
14:22;30:19;49:1,1,1
**overall (1)**
57:20
**overhear (1)**
29:3
**overwhelmed (1)**
58:2
**overwhelming (3)**
31:2,6,7
**owe (1)**
46:21

**P**

**Pangallo (6)**
32:1,3,13,24;33:4;
35:10
**paper (7)**
38:19;39:22,23;
52:13;53:1,2,19
**paperwork (2)**
6:22,23
**paragraph (6)**
14:15;18:1;28:22,23;
31:19;37:17
**parents (13)**
31:20,22,24;34:24;
35:3,6;42:3,7;49:23;
63:15,20;64:2,12
**park (1)**
51:2
**part (1)**
61:18
**parties (1)**

4:10
**party (1)**
61:23
**pay (2)**
29:19;56:24
**paying (3)**
14:16;49:10;62:23
**payment (14)**
12:18,20;14:1,18;
26:7;29:11,12;45:3;
56:19,20;60:19;61:2;
62:15,22
**payments (10)**
11:7,14,18,21;12:4,
15,23;13:8;57:11;
58:10
**peacefully (1)**
22:18
**people (3)**
22:12;42:20;46:21
**per (1)**
16:19
**period (2)**
6:11;60:24
**person (2)**
21:23;31:8
**personal (2)**
25:7;42:14
**personally (8)**
16:23;18:17;20:1;
41:23;57:16;60:15,17,
18
**phone (44)**
15:4,4,5,5,13,17;
17:3,5,11,15;18:22;
19:20;23:15,16,17;
26:5;27:18,19;31:8,13;
32:6;35:20;37:1;40:2;
41:24;42:9;43:12,15;
46:14;49:8,15,16;
56:13,18;57:9,20;
59:12;60:21;61:12;
62:6,12,21;64:1,11
**phones (1)**
19:19
**pickup (2)**
38:13;51:1
**piece (2)**
38:19;39:22
**please (6)**
4:19;14:15;19:22;
25:12;47:14;48:6
**point (7)**
12:9;13:16;31:6;
49:17;51:12;52:23;
53:8
**position (1)**
6:12
**possession (1)**
47:19
**Possibly (4)**
25:22;60:1,10;64:16
**pounds (2)**

39:5;50:22
**preparation (3)**
7:10,14,16
**prepare (1)**
6:19
**present (4)**
20:8;23:6;62:8,10
**presently (1)**
6:3
**Pretty (5)**
25:5;30:4;39:3;48:8,
12
**previously (2)**
7:4;16:2,4;19:18
**prior (3)**
13:5;18:14;31:1
**privacy (2)**
47:3;50:7
**probably (1)**
47:16
**produce (1)**
47:21
**prompted (1)**
9:17
**property (5)**
8:6,9,15;10:16;37:20
**public (1)**
63:12
**pull (1)**
38:14
**purely (1)**
22:7
**purpose (1)**
23:20
**pursuant (1)**
4:10
**pursue (1)**
11:6
**pursued (1)**
11:10
**put (1)**
29:13

**R**

**race (1)**
39:6
**ramifications (1)**
42:24
**rang (3)**
38:15;51:5,5
**reach (1)**
21:23
**read (1)**
47:17
**realize (1)**
49:17
**really (3)**
6:21;30:22;63:19
**recall (13)**
9:11;12:7;14:9;18:8;
19:7;21:13;26:9;29:15,
20;39:24;53:9,10;

59:24
**receive (6)**
16:23;18:20;26:18;
27:16;28:8;33:21
**received (7)**
10:12;14:22;15:3;
16:19;27:21;43:15;
58:3
**receiving (5)**
42:9;43:12;47:11;
54:11,15
**recognize (2)**
7:7;16:5
**record (3)**
4:8;17:10;63:12
**recordings (4)**
15:2;22:21;26:12;
35:19
**records (13)**
15:2,4,13,17;17:8,
12;22:21;23:15,16,17;
26:13;37:6;41:8
**REDIRECT (1)**
59:3
**reduction (1)**
13:1
**refers (1)**
28:23
**reflect (1)**
4:8
**regard (1)**
27:10
**regarding (3)**
9:19;29:17;42:18
**regards (1)**
25:7
**regular (2)**
11:14,18
**regularly (1)**
12:14
**reinstate (1)**
64:14
**remain (1)**
30:10
**remember (2)**
37:24;38:2
**reminder (1)**
48:11
**repetitive (1)**
48:23
**rephrase (2)**
4:20;10:24
**reply (1)**
21:16
**reporter (2)**
4:24;64:20
**represent (2)**
4:14;9:12
**representative (5)**
14:23;26:16;36:17;
37:18;58:14
**requesting (1)**
14:18

**respond (2)**
46:23;52:5
**responded (1)**
45:21
**response (11)**
16:17;19:13;30:13;
33:3;34:6;40:3,17,21;
43:19;45:21;62:9
**responses (1)**
16:6
**result (5)**
15:14;18:23;19:3;
41:24;43:2
**resulted (2)**
9:24;17:16
**retain (1)**
9:17
**retained (1)**
9:11
**return (5)**
28:16,19;30:23;
43:18;59:14
**returned (2)**
63:24;64:10
**returning (1)**
25:20
**revealed (1)**
42:13
**review (2)**
14:8;16:8
**Rheumatology (1)**
6:10
**right (29)**
8:7;11:7,11,16,24;
15:15,18;20:3;27:22;
30:23;31:10;38:21;
39:13;43:16,24;44:2,3;
45:17;49:10;50:21;
51:3;58:13;59:23;
60:16,19;62:18;63:12,
13;64:13
**ring (1)**
51:4
**ringing (1)**
31:13
**room (3)**
38:12;41:14;56:3
**rules (1)**
4:11

## S

**same (9)**
4:23;12:1;25:5;28:2,
4;31:8;46:17;48:23;
50:2
**Sanford-Brown (2)**
5:22;6:6
**save (1)**
15:22
**saw (3)**
38:13;52:14;55:24
**saying (1)**

61:24
**Scared (4)**
58:1;59:14,17,21
**scary (2)**
59:5,8
**schedule (1)**
14:2
**searching (1)**
9:19
**second (16)**
8:22;9:9;22:24;
23:12,20,21;24:7,8,12;
25:4;26:10,13;36:13;
44:18;46:16;50:4
**seconds (1)**
61:3
**send (1)**
53:18
**sense (3)**
47:7,7;59:8
**sent (1)**
37:18
**September (5)**
10:13;12:18,24;
18:21;64:11
**series (1)**
4:15
**served (1)**
16:9
**servicer (1)**
58:15
**servicing (1)**
12:7
**set (1)**
38:24
**shocked (1)**
53:1
**short-cut (1)**
8:11
**show (5)**
7:6;15:8,13;17:13;
23:17
**showed (2)**
14:7;40:15
**shown (1)**
15:17
**side (1)**
41:17
**signatory (2)**
8:17;9:3
**Signature (1)**
64:20
**signed (1)**
44:16
**significant (2)**
43:5,6
**simply (4)**
25:11;45:18;63:24;
64:10
**single (7)**
17:13;31:8;47:24;
48:1;55:11;59:7,12
**sitting (1)**

38:12
**situation (3)**
42:3;19;63:22
**Six (3)**
17:19,20,21
**Six-one (2)**
39:3;50:22
**sleepless (1)**
48:7
**somebody (11)**
30:4,20;31:1;40:5;
42:9;52:6,24;53:2,19;
61:14;63:22
**someone (4)**
9:21;15:9;33:18;
36:20
**sometime (1)**
24:19
**Sometimes (1)**
28:14
**son (1)**
52:8
**sons (1)**
5:17
**soon (1)**
53:24
**sorry (5)**
27:14;28:1,3,3;64:8
**sought (1)**
42:22
**South (1)**
5:7
**speak (7)**
4:23;7:16,21;26:15;
33:18;36:16;58:14
**speculation (3)**
54:20;61:7;64:3
**spoke (10)**
7:22;18:3,12,17;
19:17,23;29:14;33:23;
45:6;48:23
**standing (1)**
38:16
**start (5)**
49:9;54:6,7;57:2,11
**started (1)**
18:11
**startle (1)**
51:23
**state (5)**
4:6;14:16;16:16,18;
52:12
**stated (5)**
19:8;34:3;46:14;
49:7;51:9
**statements (2)**
14:12;47:18
**status (1)**
46:3
**stay (7)**
10:10;11:23;13:3,19;
20:17;26:1;45:15
**Stayed (1)**

6:18
**still (8)**
11:6;35:14,16;36:1;
41:16;47:19;52:16;
60:12
**stop (7)**
12:23;19:20,22;44:2;
48:16;59:22;60:14
**stopped (4)**
13:3,8;14:16;49:10
**stopping (1)**
13:6
**straighten (1)**
42:13
**stress (6)**
43:2,5;60:1,4,8,9
**stressed (1)**
58:1
**stressful (1)**
48:7
**stuff (2)**
42:13;59:9
**subject (2)**
14:17;46:24
**substantive (1)**
22:1
**Sulaiman (1)**
9:12
**summarize (1)**
57:21
**supervisor (6)**
29:13,14,17;56:22;
62:24;63:4
**Sure (9)**
4:7;10:18;33:13;
35:23;38:20;53:12,13,
14;56:8
**sworn (1)**
4:2

## T

**talk (7)**
22:4;25:8;40:8,10,
13;43:7;55:13
**talked (1)**
45:16
**talking (3)**
29:13;54:7;60:23;
62:7,24;63:1,7
**Tall (3)**
38:24;39:2,3
**tan (1)**
51:1
**telephone (1)**
16:15
**testified (8)**
4:3;45:14;46:6;
48:15;49:12;50:21;
52:10;58:3
**Thanks (1)**
64:18
**though (2)**

41:21;43:22
**thought (2)**
    42:6,15
**threaten (1)**
    41:20
**threatening (1)**
    9:21
**three (13)**
    5:17;19:2,18;30:20;
    31:1,4,7;41:19;47:24;
    51:14;52:4,21;59:11
**three-year (1)**
    52:8
**times (11)**
    19:18;28:14;30:20;
    31:2,4;32:23;33:9;
    43:20;46:9;47:24;51:7
**title (1)**
    8:9
**today (4)**
    7:11,14,17;28:5
**together (1)**
    44:13
**told (16)**
    24:5;29:16;30:7;
    32:8,9,17,19;33:8;
    36:20;45:5,14,18;
    54:22;56:22;57:17;
    60:15
**tone (3)**
    41:2,3;56:6
**took (1)**
    37:5
**top (2)**
    52:14;59:11
**toss (1)**
    13:11
**total (1)**
    14:22
**transferred (1)**
    12:8
**Tree (88)**
    4:14,16;11:21;12:8,
    15,18;13:9,19,22,23;
    14:2,5,17,18,23;15:3,
    10,14,16,20;16:9;
    17:16,17;18:2,9,14,20;
    23:18;25:18,21,24;
    26:6,16,19,22;27:7,11,
    17,23;29:9;32:2,13,20,
    24;33:2,6,9,14,19;34:1,
    2,4,6,8,13;36:6,10,17,
    21;37:11,14,18;40:1,
    22;42:24;43:7;44:1,20,
    23;46:1;47:11;49:9;
    50:9,15;52:9,11,13,14;
    57:11;58:12;59:22;
    60:6,9,12,15,18,22;
    62:17
**Tree's (5)**
    16:6;30:13;41:24;
    64:1,10
**tried (3)**

21:9;46:24;56:20
**trouble (1)**
    13:13
**truck (1)**
    38:13
**truthful (2)**
    14:13;16:11
**try (3)**
    4:20;25:16,19
**trying (9)**
    8:11;16:21;21:7,18,
    23;22:13;30:5;36:22;
    45:23
**TV (1)**
    38:13
**twice (8)**
    18:4,6;33:1,11;46:7,
    8;49:14;51:8
**Two (6)**
    5:24;20:21;27:6;
    51:14,15;56:10
**two-minute (2)**
    21:4;49:15
**type (1)**
    29:12
**typing (1)**
    4:24

**U**

**Uh-uh (4)**
    19:12;21:15;40:23;
    58:23
**ultimately (1)**
    9:24
**unable (1)**
    29:19
**understood (5)**
    10:15;11:5,9,13;61:1
**up (5)**
    16:19;21:21;22:14,
    15,16
**Upset (7)**
    29:24;30:2,6,7,10;
    56:8,14
**upsetting (5)**
    30:21;42:2,5,5;43:23
**urgency (2)**
    47:7;59:8
**used (1)**
    26:23
**using (1)**
    57:23

**V**

**various (1)**
    16:15
**vehicle (1)**
    50:23
**view (1)**
    52:18
**Villa (1)**

5:8
**violate (2)**
    16:16;42:1
**visit (4)**
    37:19,20;40:21;41:9
**voice (2)**
    41:2,3
**voicemail (9)**
    15:16;24:8,15,22;
    25:11;27:11;31:15;
    59:5,12
**voicemails (17)**
    15:22;19:4,7,14,22;
    25:21;26:18;28:10,17,
    20;33:21;36:18;43:19;
    46:9;55:8;59:15;60:5

**W**

**waive (1)**
    64:21
**walk (1)**
    38:10
**watching (1)**
    38:13
**way (3)**
    41:20;48:4;52:16
**ways (1)**
    43:8
**week (1)**
    13:7
**weekends (1)**
    48:2
**weight (1)**
    39:5
**weren't (11)**
    8:18;25:20;34:21;
    35:6;44:14;58:10;
    59:14,17,21;62:22,23
**What's (2)**
    5:19;48:13
**White (3)**
    39:7,8,9
**willing (1)**
    13:15
**within (1)**
    10:4
**witness (2)**
    4:2;64:22
**wit's (1)**
    48:9
**wondering (2)**
    25:5;52:24
**word (3)**
    26:22;57:3,6
**words (1)**
    26:3
**work (4)**
    13:6;40:9,9,11
**working (1)**
    13:3
**worrying (2)**
    59:9,10

**write (2)**
    32:20;35:10
**wrote (3)**
    32:4,20;35:12

**Y**

**year (4)**
    6:13,16;9:13,14
**years (3)**
    5:16,24;56:10
**yelling (1)**
    41:6
**Yesterday (3)**
    8:3;14:10,11
**younger (3)**
    41:16;51:14,15

**1**

**1 (6)**
    7:3,7;14:8,12;17:24;
    37:17
**10 (1)**
    38:8
**100 (1)**
    14:22
**11 (1)**
    38:9
**11th (2)**
    36:12,13
**12 (14)**
    18:1,6,10,14,18,22;
    20:3,14;23:1;26:10;
    27:8;28:7;33:15;36:3
**12th (16)**
    20:1,12,20;21:4;
    23:23;24:13;25:4,24;
    26:6;27:20,24;36:4,15;
    45:16;49:13;55:4

**2**

**2 (4)**
    16:1,5,8,11
**20 (5)**
    23:11;24:19;28:24;
    29:9;55:15
**2000 (1)**
    8:7
**2006 (1)**
    8:20
**2008 (3)**
    8:21;9:6;10:13
**2011 (24)**
    6:2;12:12,18,24;
    16:18;17:1;18:1,6,10,
    15,18,22;20:3,14;23:1;
    26:10;27:8,24;28:7,24;
    29:10;33:15;55:15;
    64:11
**2012 (9)**
    6:15;9:15;16:18;

17:1;28:1;3,6,8;37:23
**20th (1)**
    60:22
**22 (1)**
    14:15
**220 (2)**
    39:5;50:22
**240 (1)**
    5:7
**25 (1)**
    31:19
**27 (1)**
    18:1

**3**

**30 (1)**
    28:22
**35 (1)**
    37:17

**5**

**5 (1)**
    16:19

**6**

**6 (2)**
    9:6;16:14
**630625-2342 (1)**
    17:6

**7**

**700 (1)**
    13:7
**7-3-83 (1)**
    5:11

**8**

**8th (1)**
    18:21

**9**

**9 (1)**
    10:13